**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| IN RE: SET FORTH DATA SECURITY BREACH LITIGATION | Consolidated Case No: 1:24-cv-11688 |
| | Honorable Martha M. Pacold |
| | **PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT** |
| | **JURY TRIAL DEMANDED** |
| | This document relates to: all cases |

Plaintiffs Joel Bellefeuille, Jr., Sharon Blue, Richard Cooper, Gladys Ewing, Kim Girven, LaToya Gravely, Bertha Meza, Janice Adam, and Mary Moses (collectively, "Plaintiffs"), bring this Consolidated Class Action Complaint ("Complaint") against Defendants Set Forth, Inc. ("Set Forth") and Centrex Software, Inc. ("Centrex") (collectively, "Defendants"), individually and on behalf of all others similarly situated ("Class Members"), and allege, upon personal knowledge as to Plaintiffs' own actions and upon information and belief and their counsel's investigations as to all other matters, as follows:

## INTRODUCTION

1.      On May 21, 2024, an unauthorized user gained access to Defendants' shared CRM platform and compromised Defendants' customers' personal information (the "Data Breach" or "Breach").[1] Defendants' internal investigation revealed, on July 1, 2024, that the unauthorized user gained access to sensitive customer information stored on Defendants' platform, including customer names, addresses, dates of birth, and Social Security numbers.[2] Financial information was also exposed in the Breach, including credit reports, loan applications, and bank statements. Yet, Defendants did not notify the Maine Attorney General that the Breach affected the personal information of at least 1.5 million customers until November 8, 2024.[3] Neither were Plaintiffs nor similarly situated consumers notified of the Breach until on or around November 8, 2024.[4]

---

[1]      SET FORTH, *Notice of Data Security Incident*, https://web.archive.org/web/20241109190146/https://www.setforth.com/notice-of-data-security-incident/.

[2] *Id.*

[3] OFFICE OF THE MAINE ATTORNEY GENERAL, *Data Breach Notifications*, https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/5c00fedb-134a-4436-b778-5df30b84cdab.html.

[4] Set Forth Notice, attached as Exhibit A. A sample copy of the Notice Letter received by other Data Breach victims is available at: https://www.maine.gov/cgi-bin/agviewerad/ret?loc=1521.

2.      As a result of the Breach, cybercriminals illegally obtained the sensitive personally identifiable information ("PII") of Plaintiffs and Class Members, including, at a minimum, names, addresses, dates of birth, financial account information, credit reports, and Social Security numbers. As a result of Defendants' negligent failure to protect Plaintiffs' and Class Members' sensitive PII, the PII is now in the possession of cybercriminals who are likely to exploit it indefinitely.

3.      Defendants handled the PII in a reckless and negligent manner. Specifically, the PII was stored on Defendants' computer systems in a state that was vulnerable to cyberattacks. Upon information and belief, the method of the Data Breach and the risk of unauthorized disclosure of the Plaintiffs' and Class Members' PII were known risks to Defendants. Defendants were on notice that their failure to implement adequate security measures to address these risks left the PII of Plaintiffs and Class Members dangerously unprotected.

4.      As a result of the Data Breach, Plaintiffs and Class Members suffered concrete injuries and ascertainable losses from: (1) the invasion of their privacy; (2) the theft of their PII; (3) the lost or diminished value of their PII; (4) the loss of the benefit of their bargain; (5) the substantial, imminent, and ongoing risk of actual and attempted fraud, identity theft, and other misuse of their PII; (6) the value and opportunity cost of time spent mitigating the harms of the Breach; and/or (7) nominal damages.

5.      Plaintiffs bring this class action on behalf of consumers whose sensitive information was stolen by cybercriminals in the Breach to address Defendants' failure to adequately safeguard Plaintiffs' and Class Members' sensitive personal data and Defendants' failure to properly notify Plaintiffs and Class Members that their information was accessed by cybercriminals in the Breach.

6.     A cyberattack was eminently foreseeable. Plaintiffs and Class Members were the foreseeable and probable victims of Defendants' failure to prevent such an attack. By obtaining, collecting, using, and profiting from the PII of Plaintiffs and Class Members, Defendants assumed legal duties to protect and safeguard that information and knew, or should have known, it was responsible for protecting Plaintiffs' and Class Members' PII from unauthorized access and intrusion.

7.     Defendants admit that their systems were attacked and that Plaintiffs' and Class Members' PII was compromised in the attack.

8.     The exposed PII of Plaintiffs and Class Members can—and likely will—be sold on the dark web. In fact, it is highly probable that Plaintiffs' and Class Members' PII has already been published and circulated on the dark web as a result of the Breach.

9.     Hackers can sell the unencrypted, unredacted PII to criminals, further exacerbating the risks. As a result, Plaintiffs and Class Members must now indefinitely monitor their financial and other accounts to guard against a lifelong threat of identity theft and fraud, which is significantly heightened by the exposure of their Social Security numbers. Plaintiffs and Class Members are now forced to take proactive measures to mitigate against identity theft, including but not limited to, purchasing credit monitoring or identity protection services, purchasing credit reports, placing credit freezes and fraud alerts on their credit reports, and investigating and disputing fraudulent or suspicious activity on their financial accounts or with use of their Social Security numbers.

10.    Plaintiffs and Class Members did not choose to share their information with unauthorized third parties, so they have lost the economic value of negotiating a fair price for their PII because of the Data Breach.

11.     Armed with the PII compromised in the Data Breach, cybercriminals have already engaged in identity theft and fraud and can in the future commit a variety of crimes, including, *e.g.*, using Plaintiffs' and Class Members' PII to fraudulently open new financial accounts, take out loans, obtain government benefits, file tax returns, and obtain driver's licenses. Cybercriminals may also combine PII obtained from the Breach with other sources of personal information to subject Plaintiffs and Class Members to further instances of fraud. PII stolen from the Breach can be used in phishing emails and messages to Class Members to trick Class Members into revealing even more sensitive information or downloading ransomware, which could lead to devastating full account takeovers, financial fraud, and identity theft.

12.     Because Social Security numbers are key to numerous financial transactions and very difficult to change, Plaintiffs and Class Members cannot effectively mitigate these harms and risks caused by Defendants' failure to prevent the Breach.

13.     Defendants could have prevented this Breach by limiting access to sensitive information to only necessary employees, requiring multi-factor authentication to verify access credentials, encrypting data at rest and in transit, monitoring their systems for signs of unusual activity or the transfer of large volumes of data, and regularly rotating passwords.

14.     The compromise of Plaintiffs' and Class Members' PII was a direct result of Defendants' negligent and/or careless actions, omissions, and failure to adequately protect the PII of Plaintiffs and Class Members. Moreover, in the wake of the Data Breach, Defendants have not taken sufficient steps to notify affected individuals. Compounding these issues, at some point in

2025, Defendant Set Forth scrubbed the Data Breach notice from its website, leaving victims of the Breach with no ongoing source of information on the data breach from Defendants.[5]

15.     Plaintiffs bring this action on behalf of all persons whose PII was compromised because of Defendants' failure to: (i) adequately protect the PII of Plaintiffs and Class Members; (ii) warn Plaintiffs and Class Members of Defendants' inadequate information security practices; and (iii) effectively secure hardware containing protected PII using reasonable and effective security procedures free of vulnerabilities.

16.     Defendants disregarded the rights of Plaintiffs and Class Members by intentionally, willfully, recklessly, and/or negligently failing to take and implement adequate and reasonable measures to ensure that the PII of Plaintiffs and Class Members was safeguarded. Defendants further disregarded Plaintiffs' and Class Members' rights by failing to take reasonable and necessary steps to prevent the unauthorized disclosure of Plaintiffs' and Class Members' PII, and failing to follow appropriate standards, protocols, policies, and procedures for the encryption and protection of such sensitive data.

17.     Plaintiffs seek to remedy these harms on behalf of themselves and all similarly situated consumers whose PII was stolen in the Breach. Plaintiffs seek remedies including (i) compensation for the theft and misuse of their data; (ii) reimbursement for out-of-pocket costs, including lifetime comprehensive identity protection services; and (iii) compensation for time spent responding to the Data Breach.

---

[5]  *Compare* Set Forth, Notice of Data Security Incident, https://web.archive.org/ web/20250116004017/https://www.setforth.com/notice-of-data-security-incident/, *with* Set Forth, Page Not Found, https://www.setforth.com/notice-of-data-security-incident/ (last accessed Oct. 8, 2025). Likewise, the link provided on the formal data breach notice (https://response.idx.us/forth) is no longer operative.

18.     Because of the Data Breach, the PII of Plaintiffs and Class Members was compromised through disclosure to one or more unknown and unauthorized third parties. Plaintiffs and Class Members have a continuing interest in ensuring that their information is and remains safe and are thus entitled to injunctive and other equitable relief.

## PARTIES

### A.     Plaintiffs

19.     Plaintiff Joel Bellefeuille, Jr. is and was at all times mentioned herein a resident and citizen of Holland, Michigan.

20.     Plaintiff Sharon Blue is and was at all times mentioned herein a resident and citizen of Norwalk, Connecticut.

21.     Plaintiff Richard Cooper is and was at all times mentioned herein a resident and citizen of Rimrock, Arizona.

22.     Plaintiff Gladys Ewing is and was at all times mentioned herein a resident and citizen of Hillside, Illinois.

23.     Plaintiff Kim Girven is and was at all times mentioned herein a resident and citizen of East Hampton, Connecticut.

24.     Plaintiff LaToya Gravely is and was at all times mentioned herein a resident and citizen of the State of Ohio.

25.     Plaintiff Bertha Meza is and was at all times mentioned herein a resident and citizen of Moreno Valley, California.

26.     Plaintiff Janice Adam is and was at all times mentioned herein a resident and citizen of Castro Valley, California.

27.     Plaintiff Mary Moses is and was at all times mentioned herein a resident and citizen of Wise County, Virginia.

**B.** **Defendants**

28.     Defendant Set Forth, Inc. is a Delaware corporation, with its principal place of business at 1900 East Golf Road, Suite 550, Schaumburg, Illinois 60173. Set Forth's registered agent is VCorp Agent Services, Inc., located at 208 S. LaSalle Street, Suite 814, Schaumburg, Illinois 60173. Set Forth has previously done business under the names Forth, Inc., Debt Pay Gateway, and DebtPayPro.

29.     Defendant Centrex Software, Inc. is a California corporation with its principal place of business at 3090 Pullman Street, Suite F, Costa Mesa, California 92626. Centrex's registered agent is Thomas O'Brien Markel III, located at the same address.

**JURISDICTION AND VENUE**

30.     This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because at least one member of the putative Class, as defined below, is a citizen of a state other than that of Defendants, there are more than 100 putative Class Members, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

31.     This Court has general personal jurisdiction over Defendant Set Forth because it maintains its principal place of business in Schaumburg, Illinois, regularly conducts business in Illinois, and has sufficient minimum contacts in Illinois, such as to not offend traditional notions of fair play and substantial justice.

32.     This Court has specific personal jurisdiction over Defendant Centrex because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District. Additionally, the exercise of personal jurisdiction is proper because Centrex has purposefully availed itself of the privileges of conducting business within this District and has established sufficient minimum contacts within this District.

33.     Venue in this District is proper under 28 U.S.C. § 1391(a) through (d) because Defendant Set Forth resides in this District and a substantial part of the conduct giving rise to Plaintiffs' claims occurred in this District, including Defendants' collection or storage of Plaintiffs' and Class Members' PII.

## FACTUAL ALLEGATIONS

34.     Defendant Set Forth provides online account management services for debt relief service providers and their customers.[6] As such, Set Forth stores a litany of highly sensitive PII about its current and former consumers and its clients' current and former consumers.

35.     Defendant Centrex "provides cloud-based customer relationship management (CRM) solutions powered by the Set Forth platform" to its own clients who collect and upload consumer information.[7]

36.     Plaintiffs and Class Members are current and former customers of Defendants or Defendants' clients whose information was compromised in the Data Breach. As such, some Plaintiffs and Class Members never directly provided their PII to Defendants or had any relationship with Defendants.

37.     Upon information and belief, in the course of collecting the PII of Plaintiffs and Class Members, Defendants promised to provide confidentiality and adequate security for the data they collected through their applicable privacy policies and through other disclosures made in compliance with statutory privacy requirements.

38.     Indeed, Defendant Set Forth provides on its website: "To protect your personal information from unauthorized access and use, we use security measures that comply with federal

---

[6] FORTH, *About Us*, https://www.setforth.com/about-us/ (last visited Oct. 9, 2025).

[7] Centrex Data Breach Notice, Exhibit B.

law. These measures include computer safeguards and secured files and buildings. We also attempt to limit personal information access to only employees, agents and representatives who need to know."[8] Defendant Set Forth assures consumers that the company is "focus[ed] on security, compliance, and reliability."[9]

39.     Likewise, Defendant Centrex assures customers that they "can put [their] full trust in Centrex Software," that security is a "top priority," and that the company "has your best interest in mind when it comes to overall security."[10]

40.     Plaintiffs and Class Members, as end-users of Defendants' platforms or consumers whose information was provided to Defendants by Defendants' clients, relied on these promises and on these sophisticated business entities to keep their sensitive PII confidential and secure; to use this information for business purposes only; and to make only authorized disclosures of this information. Consumers, in general, demand security to safeguard their PII, especially when their Social Security numbers and other sensitive PII are involved.

### A.     The Data Breach

41.     On May 21, 2024, Defendants discovered suspicious activity from an unauthorized user who gained access to Defendants' systems and compromised Defendants' customers' personal information (the "Data Breach" or "Breach"). Defendants' internal investigation revealed, on July 1, 2024, that the unauthorized user gained access to sensitive customer information on Defendants' systems, including customer names, addresses, dates of birth, and Social Security numbers.

---

[8] SET FORTH, *Privacy Policy*, https://www.setforth.com/privacy-policy/.

[9] FORTH, *About Us*, https://www.setforth.com/consumers/ (last visited Oct. 9, 2025).

[10] CENTREX, *Security*, https://centrexsoftware.com/security.

42.     On or about November 8, 2024, Defendant Set Forth began sending Plaintiffs and other Data Breach victims a Notice of Data Security Incident letter (the "Notice Letter"), informing them that:

**What Happened?**

In May 2024, Forth identified suspicious activity on the network. We immediately implemented our incident response protocols, took steps to secure the network, and engaged independent computer forensic experts to assist us in conducting an investigation.

Unfortunately, the investigation determined that business documents (such as loan applications, credit reports, and bank statements) that may have contained personal information belonging to you, your spouse, a co-applicant, or a dependent may have been accessed during the incident. While there is no evidence that your specific information was misused, we want to make you aware of this incident out of an abundance of caution.

**What Information Was Involved?**

From our review, it appears that the name, address, and/or social security number of you, your spouse, a co-applicant, or a dependent may have been affected.[11]

43.     Omitted from the Notice Letter were the identities of the cybercriminals who perpetrated the Data Breach; the date(s) of the Data Breach; and any details of the root cause or the vulnerabilities exploited by the Data Breach. To date, these omitted details have not been explained or clarified to Plaintiffs or Class Members, who retain vested interests in ensuring that their PII is protected.

44.     In fact, rather than provide additional information to help Plaintiffs and Class Members understand the nature of the Breach and how to protect themselves, in the months following the Breach, Defendants have instead taken down the data breach notice that was

---

[11] Set Forth Notice, attached as Exhibit A. A sample copy of the Notice Letter received by other Data Breach victims is available at: https://www.maine.gov/cgi-bin/agviewerad/ret?loc=1521.

originally posted to the Set Forth website and have disabled the support website that was included in the letters sent to victims.[12]

45. Defendants' "disclosure" amounts to no real disclosure at all, as it fails to inform Plaintiffs and Class Members of critical details about the Data Breach with any degree of specificity. Without these details, Plaintiffs' and Class Members' ability to mitigate the harms resulting from the Data Breach are severely diminished.

46. Despite Defendants' intentional opacity about the root cause of the Data Breach, several facts may be gleaned from the Notice Letter, including: a) that this Data Breach was the work of cybercriminals; b) that the cybercriminals first infiltrated Defendants' networks and systems, and downloaded data from those networks and systems (*i.e.*, they exfiltrated, or "stole," data); and c) that once inside Defendants' networks and systems, the cybercriminals targeted information including Plaintiffs' and Class Members' Social Security numbers for download and theft.

47. In the context of notice of data breach letters of this type, Defendants' use of the phrase "may have been affected" is misleading. Companies only send notice letters because data breach notification laws require them to, and such letters are only sent to those people whose personal information Defendants reasonably believe was accessed or acquired by a threat actor. Defendants cannot hide behind legalese—by sending the Notice Letter to Plaintiffs and Class Members, Defendants admit that they have a reasonable belief that Plaintiffs' and Class Members'

---

[12] *Compare* Set Forth, Notice of Data Security Incident, https://web.archive.org/web/20250116004017/https://www.setforth.com/notice-of-data-security-incident/, *with* Set Forth, Page Not Found, https://www.setforth.com/notice-of-data-security-incident/ (last accessed Oct. 8, 2025); IDX, Page Not Found, https://response.idx.us/forth (last accessed Oct. 8, 2025) (link provided on notice letters; now dead).

names, Social Security numbers, and other sensitive information were accessed or acquired by an unknown threat actor.

48.     Indeed, the Identity Theft Research Center's 2024 Annual Data Breach Report notes that "approximately 70 percent of cyberattack-related breach notices did not include attack information, compared to 58 percent in 2023. In 2019 and previous years, ~100 percent of breach notices included attack vector information." Eva Velasquez, CEO of the Identity Theft Resource Center, remarked that "[w]ith a near-record number of compromises and over 1.3 billion victim notices, often tied to inadequate cyber practices, we are also seeing an increase in notices that provide limited actionable information for victims."[13]

49.     In a 2019 study, researchers found that "97 percent of the 161 sampled notifications were difficult or fairly difficult to read based on readability metrics, and that the language used in them may have contributed to confusion about whether the recipient of the communication was at risk and should take action." The researchers went on to note that breached entities "use hedge terms that downplay risk—using phrases like 'you might be affected' and 'you are likely to be affected'" as "[f]or most companies, those notifications are only seen as a requirement for complying with data breach notification laws rather than a way to educate and protect their customers."[14]

50.     Defendants also provided inconsistent information regarding the types of data that were compromised. The data breach notice posted (temporarily) on Defendant Set Forth's website

---

[13] Identity Theft Resource Center, *2024 Annual Data Breach Report Reveals Near-Record Number of Compromises and Victim Notices*, ITRC (Jan. 28, 2025), available at https://www.idtheftcenter.org/post/2024-annual-data-breach-report-near-record-compromises/

[14] Yixin Zou, *Companies Send Confusing Alerts About Data Breaches*, FUTURITY (May 19, 2019), available at https://www.futurity.org/data-breaches-notifications-2066072/

and the sample letter submitted to the Maine Office of the Attorney General indicated that the compromised data included "dates of birth."[15] The data breach notices received by some Plaintiffs in the mail, however, did not list dates of birth as among the categories of compromised information.[16]

51.     Moreover, in their Notice Letter, Defendants failed to specify whether they undertook any efforts to contact the approximately 1,500,000 Class Members whose data was accessed and acquired in the Data Breach to inquire whether any Class Members have suffered misuse of their data; whether Class Members should report misuse of their data to Defendants; and whether Defendants have set up any mechanism for Class Members to report any misuse of their data.

52.     Defendants had obligations created by the FTC Act, contract, common law, and industry standards to keep Plaintiffs' and Class Members' PII confidential and to protect it from unauthorized access and disclosure.

53.     Plaintiffs further believe that their PII was likely sold on the dark web following the Data Breach, as that is the *modus operandi* of cybercriminals that commit cyberattacks of this type.

---

[15]  *See* Set Forth, *Notice of Data Security Incident*, https://web.archive.org/web/20241109190146/https://www.setforth.com/notice-of-data-security-incident/;  Sample Notice Letter, https://www.maine.gov/cgi-bin/agviewerad/ret?loc=1521.

[16] *See* Centrex Notice, attached as Ex. B; Set Forth Notice, attached as Ex. A.

**B.** **Defendants Failed to Secure Plaintiffs' and Class Members' Sensitive PII**

*1.* *Data Breaches Are Preventable*

54. Defendants did not use reasonable security procedures and practices appropriate to the sensitive nature of the information they were maintaining for Plaintiffs and Class Members, such as encrypting the information or deleting information once it was no longer needed.

55. Defendants could have prevented this Data Breach by, among other things, properly encrypting or otherwise protecting their equipment and computer files containing PII.

56. As explained by the Federal Bureau of Investigation ("FBI"), "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[17]

57. To prevent and detect cyberattacks and/or ransomware attacks, Defendants could and should have implemented the following measures, as recommended by the FBI:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

---

[17] FED. BUREAU OF INVESTIGATION, How to Protect Your Networks from RANSOMWARE 3, https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions— with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[18]

58.    To prevent and detect cyberattacks and/or ransomware attacks, Defendants could and should have implemented the following measures, as recommended by the Microsoft Threat Protection Intelligence Team:

- **Secure internet-facing assets**

    o   Apply latest security updates

    o   Use threat and vulnerability management

    o   Perform regular audit; remove privileged credentials;

---

[18] *Id.* at 3-4.

- **Thoroughly investigate and remediate alerts**

    o Prioritize and treat commodity malware infections as potential full compromise;

- **Include IT Pros in security discussions**

    o Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

- **Build credential hygiene**

    o Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords;

- **Apply principle of least-privilege**

    o Monitor for adversarial activities

    o Hunt for brute force attempts

    o Monitor for cleanup of Event Logs

    o Analyze logon events;

- **Harden infrastructure**

    o Use Windows Defender Firewall

    o Enable tamper protection

    o Enable cloud-delivered protection

    o Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[19]

59.     Given that Defendants were storing the PII of their customers and/or their clients' current and former customers, Defendants could and should have implemented all of the above measures to prevent and detect cyberattacks.

---

[19] *See* MICROSOFT THREAT INTEL., *Human-Operated Ransomware Attacks: A Preventable Disaster* (Mar. 5, 2020), https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/.

60.     The occurrence of the Data Breach indicates that Defendants failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach in which data thieves acquired and accessed the PII of more than one million individuals, including Plaintiffs and Class Members.

### 2.     *Defendants Acquire, Collect, and Store the PII of Their Clients' Current and Former Customers*

61.     Defendants acquire, collect, and store a massive amount of PII of their customers and/or their clients' current and former customers.

62.     Defendants collect and store such highly sensitive personal information, such as Plaintiffs' and Class Members' PII, in the normal course of their business.

63.     By obtaining, collecting, and using Plaintiffs' and Class Members' PII, Defendants assumed legal and equitable duties and knew or should have known that they were responsible for protecting Plaintiffs' and Class Members' PII from disclosure.

64.     Plaintiffs and the Class Members have taken reasonable steps to maintain the confidentiality of their PII and would not have entrusted their PII to Defendants absent a duty to safeguard that information.

65.     Plaintiffs and the Class Members relied on Defendants to keep their PII confidential and securely maintained; to use this information for business purposes only; and to make only authorized disclosures of this information.

### 3.     *Defendants Knew, or Should Have Known, of the Significant Risk of a Data Breach Because Companies in the Debt-Collection Industry Are Common Targets of Cyberattacks*

66.     Companies that are involved in the debt-collection industry, like Defendant Set Forth, are ripe targets for cybercriminals seeking large caches of sensitive and exploitable PII that can be sold on the dark web.

- 17 -

67.     Defendants' data security obligations were particularly important given the substantial increase in cyberattacks targeting the debt-collection industry before the date of the Data Breach.

68.     Data breaches, including those perpetrated against companies in the debt-collection industry that store PII in their systems, have become widespread.

69.     In 2023, an all-time high for data compromises occurred, with 3,205 compromises affecting 353,027,892 total victims.[20] The estimated number of organizations impacted by data compromises has increased by more than 2,600 percentage points since 2018, and the estimated number of victims has increased by more than 1,400 percentage points.[21] The 3,205 compromises in 2023 represent a 78% increase over the previous year and a 72% increase over the previous all-time high for compromises in a single year (1,860), set in 2021.[22] In 2024, the number of data compromises remained at this elevated level.[23]

70.     In light of recent high profile data breaches at other industry leading companies, including T-Mobile, USA (37 million records, February-March 2023), 23andMe, Inc. (20 million records, October 2023), Wilton Reassurance Company (1.4 million records, June 2023), NCB Management Services, Inc. (1 million records, February 2023), Defendants knew or should have known that the PII it collected and maintained would be targeted by cybercriminals.

---

[20] Identity Theft Res. Ctr., *Identity Theft Resource Center 2023 Annual Data Breach Report Reveals Record Number of Compromises* (Jan. 25, 2024), https://www.idtheftcenter.org/post/2023-annual-data-breach-report-reveals-record-number-of-compromises-72-percent-increase-over-previous-high/.

[21] *Id.*

[22] *Id.*

[23] Identity Theft Res. Ctr., *Identity Theft Resource Center's 2024 Annual Data Breach Report Reveals Near-Record Number of Compromises and Victim Notices* (Jan. 28, 2025), https://www.idtheftcenter.org/post/2024-annual-data-breach-report-near-record-compromises/.

71.     Additionally, as companies have become more dependent on computer systems to run their businesses,[24] *e.g.*, due to employees working remotely, the danger posed by cybercriminals has been magnified, highlighting the need for adequate administrative, physical, and technical safeguards.[25]

72.     Defendants knew and understood that PII in the custody of companies in the debt-collection industry, such as Defendant Set Forth, is valuable and highly sought after by cybercriminals seeking to illegally monetize that PII through unauthorized access.

73.     At all relevant times, Defendants knew, or reasonably should have known, the importance of safeguarding the PII of Plaintiffs and Class Members, and of the foreseeable consequences of a breach of Defendants' data security systems, including, specifically, the significant costs that would be imposed on Plaintiffs and Class Members as a result of such a breach. Still, Defendants failed to undertake adequate cybersecurity measures to prevent the Data Breach.

74.     Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records to mitigate the harms and risks caused by the Breach. Plaintiffs and Class Members are incurring and will continue to incur such damages in addition to damages due to any fraudulent use of their PII.

---

[24] Danny Brando, et al., *Implications of Cyber Risk for Financial Stability*, FEDS NOTES (May 12, 2022), https://www.federalreserve.gov/econres/notes/feds-notes/implications-of-cyber-risk-for-financial-stability-20220512.html.

[25] Suleyman Ozarslan, *Key Threats and Cyber Risks Facing Financial Services and Banking Firms in 2022*, PICUSLABS (Mar. 24, 2022), https://www.picussecurity.com/key-threats-and-cyber-risks-facing-financial-services-and-banking-firms-in-2022.

75. The injuries to Plaintiffs and Class Members were directly and proximately caused by Defendants' failure to implement and/or maintain adequate data security measures to protect the PII of Plaintiffs and Class Members.

76. The effects of Defendants' failure to secure the PII of Plaintiffs and Class Members are long-lasting and severe. Once PII is stolen—particularly Social Security numbers—fraudulent use of that information and resulting damage to victims may continue for years.

### 4. *The PII of Plaintiffs and Class Members Exposed in the Breach Is Highly Sensitive*

77. Because Social Security Numbers are difficult to change and enable cybercriminals to commit numerous forms of devastating identity theft, they are among the most sensitive forms of PII.

78. The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[26] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[27]

---

[26] 17 C.F.R. § 248.201 (2013).
[27] *Id.*

79.     The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[28] For example, PII can be sold at a price ranging from $40 to $200.[29]

80.     A stolen Social Security number can be used alone or in combination with other sources of PII to wreak havoc upon a victim's personal and financial life. The popular personal privacy and credit monitoring service LifeLock by Norton notes that stolen Social Security numbers can be used by used by cybercriminals to, among other things, (1) "[o]pen bank accounts and credit cards in your name," (2) "[d]rain your bank account," (3) "[r]ent apartments or vehicles," (4) "[m]ake fraudulent purchases," (5) "[g]et a fake ID or driver's license," (6) "[f]ile a tax return," (7) "[s]teal your medical benefits and social security checks," and (8) "[c]ommit crimes on your record."[30]

81.     Courts have dubbed a stolen Social Security number as the "gold standard" for identity theft and fraud. Social Security numbers are among the worst kind of PII to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change.

82.     According to the Social Security Administration, each time an individual's Social Security number is compromised, "the potential for a thief to illegitimately gain access to bank accounts, credit cards, driving records, tax and employment histories and other private information

---

[28] Anita George, *Your Personal Data is for Sale on the Dark Web. Here's How Much It Costs*, DIGITAL TRENDS (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/.

[29] Ben Luthi, *Here's How Much Your Personal Information Is Selling for on the Dark Web*, EXPERIAN (Dec. 6, 2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/.

[30] Emily Lockwood, *What Can Someone Do with Your Social Security Number?*, LIFELOCK (Oct. 11, 2024), https://lifelock.norton.com/learn/identity-theft-resources/what-can-someone-do-with-your-social-security-number.

increases."[31] Moreover, "[b]ecause many organizations still use SSNs as the primary identifier, exposure to identity theft and fraud remains."[32]

83.     The Social Security Administration stresses that the loss of an individual's Social Security number can lead to identity theft and extensive financial fraud:

> Scammers use your Social Security number (SSN) to get other personal information about you. They can use your SSN and your good credit to apply for more credit in your name. Then, when they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your SSN until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought.[33]

84.     In fact, a "stolen Social Security number is one of the leading causes of identity theft and can threaten your financial health."[34] "Someone who has your SSN can use it to impersonate you, obtain credit and open bank accounts, apply for jobs, steal your tax refunds, get medical treatment, and steal your government benefits."[35]

85.     Despite these extreme risks, Social Security numbers can only be changed in "extreme cases," after a "lengthy and difficult process," in which the applicant must prove that their "identity is being misused and that the misuse is causing significant damage."[36] In other

---

[31] SOC. SEC. ADMIN., *Avoid Identity Theft: Protect Social Security Numbers*, https://www.ssa.gov/phila/ProtectingSSNs.htm.

[32] *Id.*

[33] SOC. SEC. ADMIN., *Identity Theft and Your Social Security Number*, https://www.ssa.gov/pubs/EN-05-10064.pdf.

[34] EQUIFAX, *How to Protect Yourself from Social Security Number Identity Theft*, https://www.equifax.com/personal/education/identity-theft/articles/-/learn/social-security-number-identity-theft/.

[35] Julia Kagan, *What Is an SSN? What to Know About Social Security Numbers*, INVESTOPEDIA (Sept. 2, 2024), https://www.investopedia.com/terms/s/ssn.asp.

[36] Emily Lockwood, *What Can Someone Do with Your Social Security Number?*, LIFELOCK (Oct. 11, 2024), https://lifelock.norton.com/learn/identity-theft-resources/what-can-someone-do-with-your-social-security-number.

words, preventative action to defend against the expected imminent misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

86.     Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[37]

87.     For these reasons, some courts have referred to Social Security numbers as the "gold standard" for identity theft. *Portier v. NEO Tech. Sols.*, No. 3:17-CV-30111, 2019 WL 7946103, at *12 (D. Mass. Dec. 31, 2019) ("Because Social Security numbers are the gold standard for identity theft, their theft is significant . . . . Access to Social Security numbers causes long-lasting jeopardy because the Social Security Administration does not normally replace Social Security numbers."), *report and recommendation adopted*, No. 3:17-CV-30111, 2020 WL 877035 (D. Mass. Jan. 30, 2020); *see also McFarlane v. Altice USA, Inc*., 2021 WL 860584, at *4 (S.D.N.Y. Mar. 8, 2021) (noting that Social Security Numbers are arguably "the most dangerous type of personal information in the hands of identity thieves" because they are immutable and can be used to "impersonat[e] [the victim] to get medical services, government benefits, ... tax refunds, [and] employment." . . . Unlike a credit card number, which can be changed to eliminate the risk of harm following a data breach, "[a] social security number derives its value in that it is immutable," and when it is stolen it can "forever be wielded to identify [the victim] and target her in fraudulent schemes and identity theft attacks.").

---

[37] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft.

88.     Similarly, the California state government warns consumers that "[o]riginally, your Social Security number (SSN) was a way for the government to track your earnings and pay your retirement benefits. But over the years, it has become much more than that. It is the key to a lot of your personal information. With your name and SSN, an identity thief could open new credit and bank accounts, rent an apartment, or even get a job."[38]

89.     The information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. Some of the information compromised in the Data Breach is impossible to "close" and difficult, if not impossible, to change—Social Security numbers, birth dates, and names.

90.     This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[39]

91.     Among other forms of fraud, identity thieves may use PII to obtain driver's licenses, government benefits, medical services, and housing, or even give false information to police.

92.     The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, as well as a time lag between when PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

---

[38] CAL. ATT'Y GEN., *Your Social Security Number: Controlling the Key to Identity Theft*, https://oag.ca.gov/idtheft/facts/your-ssn.

[39] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT WORLD (Feb. 6, 2015), https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

[L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[40]

93.     Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to damages due to any fraudulent use of their PII.

### 5.     Defendants Fail to Comply with FTC Guidelines

94.     The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses highlighting the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

95.     In 2016, the FTC updated its publication, "Protecting Personal Information: A Guide for Business," which established cybersecurity guidelines for businesses. These guidelines note that businesses should protect the personal consumer information they keep; properly dispose of personal information that is no longer needed; encrypt information stored on their computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[41]

96.     The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating that

---

[40] U.S. Gov't Accountability Off., GAO-07-737, *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown* 29 (June 2007), https://www.gao.gov/assets/gao-07-737.pdf [hereinafter GAO Report].
[41] *Protecting Personal Information: A Guide for Business*, Federal Trade Commission (2016), available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[42]

97.     The FTC further recommends that companies not maintain PII longer than needed to authorize a transaction; limit access to sensitive data; require complex passwords on their network; use industry-tested methods for security; monitor for suspicious activity on their network; and verify that third-party service providers have implemented reasonable security measures.

98.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect consumer data, treating their failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act (the "FTC Act"), 15 U.S.C. § 45. The FTC's orders resulting from these actions further clarify the measures that businesses must take to meet their data security obligations.

99.     These FTC enforcement actions include actions against debt collection companies, like Defendant Set Forth.

100.     Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, a business's unfair act or practice of failing to use reasonable measures to protect PII. The FTC publications and orders described above also form part of the basis of Defendants' duty in this regard.

101.     Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to the PII of their customers and/or their clients' customers or to comply with applicable industry standards constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

---

[42] *Id.*

102.    Upon information and belief, Defendants were at all times fully aware of their obligations to protect the PII of their customers and/or their clients' customers. Defendants were also aware of the significant repercussions that would result from their failure to do so. Accordingly, Defendants' conduct was particularly unreasonable given the nature and amount of PII they obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiffs and the Class.

### 6.    *Defendants Fail to Comply with Industry Standards*

103.    As noted above, experts studying cybersecurity routinely identify debt collection companies in possession of PII as being particularly vulnerable to cyberattacks because of the value of the PII which they collect and maintain.

104.    Several best practices have been identified that, at a minimum, should be implemented by debt collection companies in possession of PII, like Defendants, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data and limiting which employees can access sensitive data. Defendants failed to follow these industry best practices, including a failure to implement multi-factor authentication.

105.    Other cybersecurity best practices that are standard for debt collection companies and companies entrusted with such data include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points. Defendants failed to follow these cybersecurity best practices, including failing to properly train staff.

106.    Defendants failed to meet the minimum standards of one or more of the following frameworks: the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

107.    These foregoing frameworks are existing and applicable industry standards for debt collection companies and companies entrusted with such data, and upon information and belief, Defendants failed to comply with one or more of these accepted standards, thereby opening the door to the threat actor and causing the Data Breach.

**C.    Plaintiffs and the Class Members Suffered and Will Continue to Suffer Common Injuries and Damages**

108.    As a result of Defendants' ineffective and inadequate data security practices, the Data Breach, and the foreseeable consequences of PII ending up in the possession of criminals, the risk of identity theft to the Plaintiffs and Class Members has materialized and is imminent, and Plaintiffs and Class Members have all sustained actual injuries, including: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of their PII; (iv) loss of the benefit of the bargain; (v) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vi) nominal damages; and (vii) a continued and increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect it.

### 1. The Data Breach Increases Plaintiffs' and Class Members' Risk of Identity Theft

109.    The unencrypted PII of Class Members is now in the hands of undisclosed cybercriminals, and will end up for sale on the dark web because that is the *modus operandi* of hackers.

110.    Unencrypted PII may also fall into the hands of companies that will use the detailed PII for targeted marketing without the approval of Plaintiffs and Class Members. Simply put, unauthorized individuals can easily access the PII of Plaintiffs and Class Members.

111.    The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal PII to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

112.    Plaintiffs' and Class Members' PII is of great value to hackers and cyber criminals, and the data stolen in the Data Breach has been used and will continue to be used in a variety of sordid ways for criminals to exploit Plaintiffs and Class Members and to profit off their misfortune.

113.    Due to the risk of one's Social Security number being exposed, state legislatures have passed laws in recognition of the risk: "[t]he social security number can be used as a tool to perpetuate fraud against a person and to acquire sensitive personal, financial, medical, and familial information, the release of which could cause great financial or personal harm to an individual. While the social security number was intended to be used solely for the administration of the federal Social Security System, over time this unique numeric identifier has been used extensively for identity verification purposes."[43]

---

[43] *See* N.C. Gen. Stat. § 132-1.10(1).

114.    Moreover, "SSNs have been central to the American identity infrastructure for years, being used as a key identifier . . . . U.S. banking processes have also had SSNs baked into their identification process for years. In fact, SSNs have been the gold standard for identifying and verifying the credit history of prospective customers."[44]

115.    "Despite the risk of fraud associated with the theft of Social Security numbers, just five of the nation's largest 25 banks have stopped using the numbers to verify a customer's identity after the initial account setup."[45] Accordingly, since Social Security numbers are frequently used to verify an individual's identity after logging onto an account or attempting a transaction, "[h]aving access to your Social Security number may be enough to help a thief steal money from your bank account."[46]

116.    One such example of criminals piecing together bits and pieces of compromised PII for profit is the development of "Fullz" packages.

117.    "Fullz" are packages of various PII for a victim, which may include, among other things, the victim's name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off of those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning

---

[44] Hussayn Kassai, *Banks need to stop relying on Social Security numbers*, AM. BANKER (NOV. 12, 2018), https://www.americanbanker.com/opinion/banks-need-to-stop-relying-on-social-security-numbers.

[45] Ann Carns, *Just 5 Banks Prohibit Use of Social Security Numbers*, N.Y. TIMES (Mar. 20, 2013), https://archive.nytimes.com/bucks.blogs.nytimes.com/2013/03/20/just-5-banks-prohibit-use-of-social-security-numbers/.

[46] CREDIT.COM, *What Can Someone Do With Your Social Security Number?*, https://www.credit.com/blog/5-things-an-identity-thief-can-do-with-your-social-security-number-108597/.

credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge.[47]

118.    With "Fullz" packages, cyber-criminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

119.    The development of "Fullz" packages means here that the stolen PII from the Data Breach can easily be used to link and identify it to Plaintiffs' and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

120.    Thus, even if certain information (such as contact information) was not stolen in the data breach, criminals can still easily create a comprehensive "Fullz" package.

121.    Then, this comprehensive dossier can be sold—and then resold in perpetuity—to cybercriminals and other criminals (like scam telemarketers).

---

[47] *See*, *e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen From Texas Life Insurance Firm*, KREBS ON SECURITY (Sep. 18, 2014), https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm/.

### 2. Plaintiffs and Class Members Suffered Injury from the Loss of Time to Mitigate the Risk of Identity Theft and Fraud

122. As a result of the recognized risk of identity theft, when a Data Breach occurs, and an individual is notified by a company that their PII was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm—yet, the resource and asset of time has been lost.

123. Thus, due to the actual and imminent risk of identity theft, Defendants' Notice Letter instructs Plaintiffs and Class Members to take various precautionary measures to protect their information, including telling them to "remain vigilant in reviewing your financial account statements and credit reports for fraudulent or irregular activity."[48]

124. In addition, Defendants' Notice letters include multiple pages devoted to "Recommended Steps to Help Protect your Information" that recommend that Plaintiffs and Class Members undertake activities such as monitoring their accounts, placing security freezes and fraud alerts on their accounts, and contacting consumer credit reporting bureaus.[49]

125. Defendants' extensive suggestion of steps that Plaintiffs and Class Members must take in order to protect themselves from identity theft and/or fraud demonstrates the significant time that Plaintiffs and Class Members must undertake in response to the Data Breach. Plaintiffs' and Class Members' time is highly valuable and irreplaceable, and accordingly, Plaintiffs and Class Members suffered actual injury and damages in the form of lost time that they spent on

---

[48] Exhibit A and B (Notice Letters).

[49] *Id.*

mitigation activities in response to the Data Breach and at the direction of Defendants' Notice Letter.

126.    Plaintiffs and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as researching and verifying the legitimacy of the Data Breach, replacing impacted credit cards, and signing up for credit monitoring insurance services. Accordingly, the Data Breach has caused Plaintiffs and Class Members to suffer actual injury in the form of lost time—which cannot be recaptured—spent on mitigation activities.

127.    Plaintiffs' mitigation efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[50]

128.    Plaintiffs' mitigation efforts are also consistent with the steps that FTC recommends that data breach victims take to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[51]

### 3.    The Value of Plaintiffs' and Class Members' PII Was Diminished as a Result of the Breach

129.    PII is a valuable property right. Corporate America generates tremendous revenue from collection and sale of such data. And PII is sold and distributed on the dark web and through illicit criminal networks at specific, identifiable prices.

---

[50] GAO Report at 2.

[51] *See* FED. TRADE COMM'N, IdentityTheft.gov, https://www.identitytheft.gov/Steps.

130. Sensitive PII can sell for as much as $363 per record according to the Infosec Institute.[52]

131. An active and robust legitimate marketplace for PII also exists. In 2019, the data brokering industry was worth roughly $200 billion.[53]

132. In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[54]

133. For instance, consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $60 a year.[55]

134. As a result of the Data Breach, Plaintiffs' and Class Members' PII, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiffs or Class Members for their property, resulting in an economic loss. Moreover, the PII is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

135. At all relevant times, Defendants knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiffs and Class Members, and of the foreseeable consequences that would occur if Defendants' data security systems were breached, including,

---

[52] Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, INFOSEC (July 27, 2015), https://www.infosecinstitute.com/resources/healthcare-information-security/hackers-selling-healthcare-data-in-the-black-market/.

[53] David Lazarus, *Shadowy Data Brokers Make the Most of Their Invisibility Cloak*, L.A. TIMES (Nov. 5, 2019), https://www.latimes.com/business/story/2019-11-05/column-data-brokers.

[54] Datacoup, https://datacoup.com/.

[55] NIELSEN, Join Our Nielsen Panel and Get Rewarded, https://computermobilepanel.nielsen.com/ui/US/en/sdp/landing.

specifically, the significant costs that would be imposed on Plaintiffs and Class Members as a result of a breach.

136.    Fraudulent activity resulting from the Data Breach may not come to light for years. Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records. The Class is incurring and will continue to incur such damages in addition to damages due to any fraudulent use of their PII.

137.    Defendants were, or should have been, fully aware of the unique type and the significant volume of data on Defendants' servers, which amounted to more than one million individuals' detailed personal information, and, thus, Defendants were or should have been aware of the significant number of individuals who would be harmed by the exposure of the data.

138.    Plaintiffs' and Class Members' injuries were directly and proximately caused by Defendants' failure to implement and/or maintain adequate data security measures to protect the PII of Plaintiffs and Class Members.

### 4.    *The Future Cost of Credit and Identity Theft Monitoring is Reasonable and Necessary*

139.    Given the type of targeted attack in this case, sophisticated criminal activity, and the type of PII involved, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the PII for identity theft crimes, such as opening bank accounts in the victims' names to make purchases or to launder money; filing false tax returns; taking out loans or lines of credit; or filing false unemployment claims.

140.    Such fraud may go undetected until debt collection calls begin months, or even years, later. An individual may not know that their PII was used to file for unemployment benefits

until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

141.    Moreover, Social Security Numbers can only be changed *after* the occurrence of identity theft or fraud, preventing Plaintiffs and Class Members from effectively shielding themselves from future identity theft or fraud caused by the Breach.

142.    Consequently, Plaintiffs and Class Members are at an increased risk of fraud and identity theft for many years into the future.

143.    The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is reasonable and necessary cost to monitor and protect Class Members from the risk of identity theft that arose from Defendants' Data Breach.

### 5.    *Plaintiffs and Class Members Lost the Benefit of Their Bargain*

144.    Furthermore, Defendants' poor data security practices deprived Plaintiffs and Class Members of the benefit of their bargain. When agreeing to pay Defendants' clients for products or services that required disclosing their PII, Plaintiffs, Class Members, and other reasonable consumers understood and expected that they were, in part, paying for necessary data security to protect their PII. Because Defendants did not, in fact, provide that expected data security, Plaintiffs and Class Members received products or services that were of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendants' clients.

### D.    Plaintiffs' Experiences

***Plaintiff Joel Bellefeuille, Jr.***

145.    Plaintiff Bellefeuille used the Set Forth software platform in relation to accounts he held with Freedom Debt Relief and Cordoba Legal Group.

146.    Upon information and belief, at the time of the Data Breach, Defendants maintained Plaintiff Bellefeuille's PII in their systems, which they had access to.

147.    Plaintiff Bellefeuille received the Notice letter, by U.S. mail, from Defendant Set Forth, addressed directly to Plaintiff Bellefeuille, which was dated November 8, 2024. According to the Notice Letter, Plaintiff Bellefeuille's PII was improperly accessed and obtained by unauthorized third parties, including the name, address, and/or Social Security number of Plaintiff Bellefeuille and/or his spouse, co-applicant, or dependent.[56]

148.    Plaintiff Bellefeuille is very careful about sharing his PII. Plaintiff Bellefeuille stores any documents containing his PII in a safe and secure location. He has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Plaintiff Bellefeuille would not have entrusted his PII to Defendants had he known of their lax data security policies.

149.    In order and as a condition to obtain debt relief services from Defendants, Plaintiff Bellefeuille was required to provide his PII to Defendants.

150.    In September 2024, Plaintiff Bellefeuille incurred a fraudulent charge of $34.55 on his debit card, which he ultimately was able to get reversed.

151.    Plaintiff Bellefeuille has also experienced a significant uptick in spam phone calls, relating to medical insurance, funeral homes, and healthcare since the Data Breach.

152.    As a result of the Data Breach, Plaintiff Bellefeuille made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach, continuously monitoring his accounts, and contacting his bank and credit card companies about fraudulent and suspicious activity. Plaintiff Bellefeuille has spent at least 30 minutes most days dealing with the Data Breach—valuable time Plaintiff Bellefeuille otherwise

---

[56] *See* Exhibit C.

would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

153.    Plaintiff Bellefeuille suffered actual injury from having his PII compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) theft of PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to his PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII.

154.    The Data Breach has caused Plaintiff Bellefeuille to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendants have still not fully informed him of key details about the Data Breach's occurrence.

155.    As a result of the Data Breach, Plaintiff Bellefeuille anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

156.    As a result of the Data Breach, Plaintiff Bellefeuille is at a present risk and will continue to be at increased risk of identity theft and fraud for life.

157.    Plaintiff Bellefeuille has a continuing interest in ensuring that his PII, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

158.    Plaintiff Bellefeuille greatly values his privacy and would not have provided his PII or undertaken the services and paid the amounts that he did, or amounts paid on his behalf, if he had known that his PII would be maintained using inadequate data security systems.

**Plaintiff Sharon Blue**

159.    Upon information and belief, at the time of the Data Breach, Defendants maintained Plaintiff Blue's PII in their systems, which they had access to.

160.    Plaintiff Blue received the Notice letter, by U.S. mail, from Defendant Set Forth, addressed directly to Plaintiff Blue, which was dated November 8, 2024. According to the Notice Letter, Plaintiff Blue's PII was improperly accessed and obtained by unauthorized third parties, including the name, address, and/or Social Security number of Plaintiff Blue and/or her spouse, co-applicant, or dependent.[57]

161.    Plaintiff Blue is very careful about sharing her PII. Plaintiff Blue stores any documents containing her PII in a safe and secure location. She has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Plaintiff Blue would not have entrusted her PII to Defendants had she known of their lax data security policies.

162.    In order and as a condition to obtain debt relief services from Defendants, Plaintiff Blue was required to provide her PII to Defendants.

163.    Plaintiff Blue received a Total Credit Card and a Cashapp Credit Card that she never applied for.

164.    Plaintiff Blue also received a cell phone bill in her name for an unknown telephone number.

---

[57] *See* Exhibit D.

165.    When Plaintiff Blue checked Experian in September 2025, she found there was an individual with her name and Social Security number connected to an address she did not recognize.

166.    Plaintiff Blue has experienced a significant uptick in spam calls, emails, and text messages since the Data Breach.

167.    As a result of the Data Breach, Plaintiff Blue made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach, contacting credit bureaus, continuously monitoring her accounts, contacting banks, credit card companies, or other vendors about suspicious activity, and investigating suspicious activity on her accounts. Plaintiff Blue has spent six hours dealing with the Data Breach—valuable time Plaintiff Blue otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

168.    Plaintiff Blue suffered actual injury from having her PII compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) theft of PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to her PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII.

169.    The Data Breach has caused Plaintiff Blue to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendants have still not fully informed her of key details about the Data Breach's occurrence.

170.    As a result of the Data Breach, Plaintiff Blue anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

171.    As a result of the Data Breach, Plaintiff Blue is at a present risk and will continue to be at increased risk of identity theft and fraud for life.

172.    Plaintiff Blue has a continuing interest in ensuring that her PII, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

173.    Plaintiff Blue greatly values her privacy and would not have provided her PII or undertaken the services and paid the amounts that she did, or amounts paid on her behalf, if she had known that her PII would be maintained using inadequate data security systems.

***Plaintiff Richard Cooper***

174.    Plaintiff Cooper does not recall contracting directly with Defendants and is unsure of how they obtained access to his PII.

175.    Upon information and belief, at the time of the Data Breach, Defendants maintained Plaintiff Cooper's PII in their systems, which they had access to.

176.    Plaintiff Cooper received the Notice letter, by U.S. mail, from Defendant Set Forth, addressed directly to Plaintiff Cooper, which was dated November 8, 2024. According to the Notice Letter, Plaintiff Cooper's PII was improperly accessed and obtained by unauthorized third

parties, including the name, address, and/or Social Security number of Plaintiff Cooper and/or his spouse, co-applicant, or dependent.[58]

177.    Plaintiff Cooper is very careful about sharing his PII. Plaintiff Cooper stores any documents containing his PII in a safe and secure location. He has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Plaintiff Cooper would not have entrusted his PII to Defendants had he known of their lax data security policies.

178.    In order and as a condition to obtain services from Defendants, Plaintiff Cooper was required to provide his PII to Defendants.

179.    Plaintiff Cooper has received notifications of unauthorized attempts to modify his Amerihome mortgage loan.

180.    Plaintiff Cooper's Cashapp account was hacked and $12,000 was withdrawn from the account.

181.    Plaintiff Cooper's email and phone have been hacked.

182.    Plaintiff Cooper's credit reports list charges that he never made or authorized.

183.    Plaintiff Cooper changed his bank from Wells Fargo to Bank of America to mitigate the impact of the Data Breach.

184.    As a result of the Data Breach, Plaintiff Cooper made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach, continuously monitoring his accounts, investigating fraudulent and suspicious activity, contacting Cashapp, his banks, and credit card companies about fraudulent and suspicious activity, and changing his passwords for at-risk, sensitive and financial accounts. Plaintiff Cooper has spent 25 hours dealing with the Data Breach—valuable time Plaintiff Cooper otherwise would have

---

[58] *See* Exhibit E.

spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

185.    Plaintiff Cooper suffered actual injury from having his PII compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) theft of PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to his PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII.

186.    The Data Breach has caused Plaintiff Cooper to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendants have still not fully informed him of key details about the Data Breach's occurrence.

187.    As a result of the Data Breach, Plaintiff Cooper anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

188.    As a result of the Data Breach, Plaintiff Cooper is at a present risk and will continue to be at increased risk of identity theft and fraud for life.

189.    Plaintiff Cooper has a continuing interest in ensuring that his PII, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

- 43 -

190.     Plaintiff Cooper greatly values his privacy and would not have provided his PII or undertaken the services and paid the amounts that he did, or amounts paid on his behalf, if he had known that his PII would be maintained using inadequate data security systems.

**Plaintiff Gladys Ewing**

191.     Plaintiff Ewing does not recall contracting directly with Defendants and is unsure how they obtained her PII.

192.     Upon information and belief, at the time of the Data Breach, Defendants maintained Plaintiff Ewing's PII in their systems, which they had access to.

193.     Plaintiff Ewing received the Notice letter, by U.S. mail, from Defendant Set Forth, addressed directly to Plaintiff Ewing, which was dated November 8, 2024. According to the Notice Letter, Plaintiff Ewing's PII was improperly accessed and obtained by unauthorized third parties, including the name, address, and/or Social Security number of Plaintiff Ewing and/or her spouse, co-applicant, or dependent.[59]

194.     Plaintiff Ewing is very careful about sharing her PII. Plaintiff Ewing stores any documents containing her PII in a safe and secure location. She has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Plaintiff Ewing would not have entrusted her PII to Defendants had she known of their lax data security policies.

195.     In order and as a condition to obtain services from Defendants, Plaintiff Ewing was required to provide her PII to Defendants.

196.     In July 2024, Plaintiff Ewing applied for a $5,000 personal loan from Lightstream Loan Company. A customer representative named "Eathan" contacted Plaintiff Ewing requesting

---

[59] *See* Exhibit F.

her banking information. On July 15, 2024, $900 was deposited into her account from a vendor named "Foursight."

197.    Eathan then requested Plaintiff Ewing to send $460 back to him through Cashapp under the name "Jawuan Briscoe."

198.    An unknown and unauthorized actor filed a dispute of the $900 charge with USAA, Plaintiff Ewing's bank. On July 16, 2024, Plaintiff Ewing notified USAA that she did not dispute the charge.

199.    On July 16, 2024, Plaintiff Ewing was informed that a check of $2,480.15 from "Language Services Associates" was deposited in her account.

200.    On July 17, 2024, USAA notified Plaintiff Ewing that it was closing all of her accounts.

201.    Plaintiff Ewing's paycheck direct deposit was put on hold as a result of the bank account closure.

202.    Plaintiff Ewing reported the above events to the FBI's Internet Crime Complaint Center.

203.    As a result of the Data Breach, Plaintiff Ewing made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach, contacting credit bureaus, continuously monitoring her accounts, investigating suspicious activity on her accounts, contacting her bank about suspicious activity, and changing her passwords for at-risk, sensitive, and financial accounts. Plaintiff Ewing has spent 10 to 20 hours dealing with the Data Breach—valuable time Plaintiff Ewing otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

204.    Plaintiff Ewing suffered actual injury from having her PII compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) theft of PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to her PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII.

205.    The Data Breach has caused Plaintiff Ewing to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendants have still not fully informed her of key details about the Data Breach's occurrence.

206.    As a result of the Data Breach, Plaintiff Ewing anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

207.    As a result of the Data Breach, Plaintiff Ewing is at a present risk and will continue to be at increased risk of identity theft and fraud for life.

208.    Plaintiff Ewing has a continuing interest in ensuring that her PII, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

209.    Plaintiff Ewing greatly values her privacy and would not have provided her PII or undertaken the services and paid the amounts that she did, or amounts paid on her behalf, if she had known that her PII would be maintained using inadequate data security systems.

**Plaintiff Kim Girven**

210.    Plaintiff Girven provided her PII to Defendant Set Forth to receive its debt relief services.

211.    Plaintiff Girven recalls making monthly payments to Defendant Set Forth when she used its services.

212.    Upon information and belief, at the time of the Data Breach, Defendants maintained Plaintiff Girven's PII in their systems, which they had access to.

213.    Plaintiff Girven received the Notice letter, by U.S. mail, from Defendant Set Forth, addressed directly to Plaintiff Girven, which was dated November 8, 2024. According to the Notice Letter, Plaintiff Girven's PII was improperly accessed and obtained by unauthorized third parties, including the name, address, and/or Social Security number of Plaintiff Girven and/or her spouse, co-applicant, or dependent.[60]

214.    Plaintiff Girven is very careful about sharing her PII. Plaintiff Girven stores any documents containing her PII in a safe and secure location. She has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Plaintiff Girven would not have entrusted her PII to Defendants had she known of their lax data security policies.

215.    In order and as a condition to obtain debt relief services from Defendants, Plaintiff Girven was required to provide her PII to Defendants, including, among other things: name,

---

[60] *See* Exhibit G.

address, Social Security number, date of birth, email, phone number, bank information, income, and credit information.

216.    In the summer of 2024, Plaintiff Girven received a notification thanking her for a purchase that she never authorized. Plaintiff Girven contacted PayPal, changed her account password, and successfully got the charge reversed.

217.    In October 2025, Plaintiff Girven received notice of a suspicious charge from her bank. She was able to cancel the charge and receive a replacement debit card.

218.    Upon information and belief, Plaintiff Girven has been notified that her PII is on the dark web.

219.    Plaintiff Girven was also forced to purchase additional storage due to the excessive spam emails and text messages she has received since the Data Breach.

220.    As a result of the Data Breach, Plaintiff Girven made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach, contacting credit bureaus, continuously monitoring her accounts, investigating suspicious activity on her accounts, contacting her bank about suspicious activity, and changing her passwords for at-risk, sensitive, and financial accounts. Plaintiff Girven has spent 40 hours dealing with the Data Breach—valuable time Plaintiff Girven otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

221.    Plaintiff Girven suffered actual injury from having her PII compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) theft of PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost

opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to her PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII.

222.    The Data Breach has caused Plaintiff Girven to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendants have still not fully informed her of key details about the Data Breach's occurrence. The Data Breach has forced Plaintiff Girven to alter her financial practices and Plaintiff Girven avoids using credit and debit cards out of fear that her account information might be exfiltrated.

223.    As a result of the Data Breach, Plaintiff Girven anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

224.    As a result of the Data Breach, Plaintiff Girven is at a present risk and will continue to be at increased risk of identity theft and fraud for life.

225.    Plaintiff Girven has a continuing interest in ensuring that her PII, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

226.    Plaintiff Girven greatly values her privacy and would not have provided her PII or undertaken the services and paid the amounts that she did, or amounts paid on her behalf, if she had known that her PII would be maintained using inadequate data security systems.

*Plaintiff LaToya Gravely*

227.     Plaintiff Gravely provided her PII to Defendant Set Forth to receive its debt relief services around 2021 or 2022.

228.     Upon information and belief, at the time of the Data Breach, Defendants maintained Plaintiff Gravely's PII in their systems, which they had access to.

229.     Plaintiff Gravely received the Notice letter, by U.S. mail, from Defendant Set Forth, addressed directly to Plaintiff Gravely, which was dated November 8, 2024. According to the Notice Letter, Plaintiff Gravely's PII was improperly accessed and obtained by unauthorized third parties, including the name, address, and/or Social Security number of Plaintiff Gravely and/or her spouse, co-applicant, or dependent.[61]

230.     Plaintiff Gravely is very careful about sharing her PII. Plaintiff Gravely stores any documents containing her PII in a safe and secure location. She has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Plaintiff Gravely would not have entrusted her PII to Defendants had she known of their lax data security policies.

231.     In order and as a condition to obtain debt relief services from Defendants, Plaintiff Gravely was required to provide her PII to Defendants.

232.     In late 2024, Plaintiff Gravely received several alerts of unauthorized individuals attempting to charge her Chime account.

233.     Plaintiff Gravely has received at least three text message alerts in the past year informing her of unauthorized attempts to charge her debit card.

---

[61] *See* Exhibit H.

234. Plaintiff Gravely has experienced a significant uptick in spam calls, emails, and text messages since the Data Breach. She has received emails purporting to be from Google about deposits she never made.

235. As a result of the Data Breach, Plaintiff Gravely made reasonable efforts to mitigate the impact of the Data Breach, including verifying the legitimacy of the Data Breach, continuously monitoring her accounts, investigating suspicious activity on her accounts, and changing her passwords for at-risk, sensitive, and financial accounts. Plaintiff Gravely has spent several hours dealing with the Data Breach—valuable time Plaintiff Gravely otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

236. Plaintiff Gravely suffered actual injury from having her PII compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) theft of PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to her PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII.

237. The Data Breach has caused Plaintiff Gravely to suffer fear, anxiety, and stress about her PII no longer being private, which has been compounded by the fact that Defendants have still not fully informed her of key details about the Data Breach's occurrence.

238.    As a result of the Data Breach, Plaintiff Gravely anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

239.    As a result of the Data Breach, Plaintiff Gravely is at a present risk and will continue to be at increased risk of identity theft and fraud for life.

240.    Plaintiff Gravely has a continuing interest in ensuring that her PII, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

241.    Plaintiff Gravely greatly values her privacy and would not have provided her PII or undertaken the services and paid the amounts that she did, or amounts paid on her behalf, if she had known that her PII would be maintained using inadequate data security systems.

***Plaintiff Bertha Meza***

242.    Plaintiff Meza does not recall contracting directly with Defendants and does not know how they obtained access to her PII.

243.    Upon information and belief, at the time of the Data Breach, Defendants maintained Plaintiff Meza's PII in their systems, which they had access to.

244.    Plaintiff Meza received the Notice letter, by U.S. mail, from Defendant Set Forth, addressed directly to Plaintiff Meza, which was dated November 8, 2024. According to the Notice Letter, Plaintiff Meza's PII was improperly accessed and obtained by unauthorized third parties, including the name, address, and/or Social Security number of Plaintiff Meza and/or her spouse, co-applicant, or dependent.[62]

---

[62] *See* Exhibit I.

245.    Plaintiff Meza is very careful about sharing her PII. Plaintiff Meza stores any documents containing her PII in a safe and secure location. She has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Plaintiff Meza would not have entrusted her PII to Defendants had she known of their lax data security policies.

246.    In order and as a condition to obtain services from Defendants, Plaintiff Meza was required to provide her PII to Defendants.

247.    Plaintiff Meza has received numerous notifications that her PII was found on the dark web.

248.    Plaintiff Meza has also experienced a significant uptick in spam phone calls, emails, and texts related to loans since the Data Breach.

249.    As a result of the Data Breach, Plaintiff Meza made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach, continuously monitoring her accounts, changing her passwords, and enabling credit monitoring alerts. Plaintiff Meza has spent over eight hours dealing with the Data Breach—valuable time Plaintiff Meza otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

250.    Plaintiff Meza suffered actual injury from having her PII compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) theft of PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to her PII, which: (a) remains unencrypted and available for unauthorized third

parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII.

251.    The Data Breach has caused Plaintiff Meza to suffer fear, anxiety, and stress about the exfiltration of her PII and the potential of her PII being exploited by threat actors. Plaintiff Meza has had difficulty sleeping due to thinking and worrying about the Data Breach. Plaintiff Meza's emotional distress has been compounded by the fact that Defendants have still not fully informed her of key details about the Data Breach's occurrence.

252.    As a result of the Data Breach, Plaintiff Meza anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

253.    As a result of the Data Breach, Plaintiff Meza is at a present risk and will continue to be at increased risk of identity theft and fraud for life.

254.    Plaintiff Meza has a continuing interest in ensuring that her PII, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

255.    Plaintiff Meza greatly values her privacy and would not have provided her PII or undertaken the services and paid the amounts that she did, or amounts paid on her behalf, if she had known that her PII would be maintained using inadequate data security systems.

***Plaintiff Janice Adam***

256.    Plaintiff Adam was a client of Set Forth and provided her PII, including her credit card number, bank account routing number, email address, and date of birth, to Set Forth over the phone.

257. Upon information and belief, at the time of the Data Breach, Defendants maintained Plaintiff Adam's PII in their systems, which they had access to.

258. Plaintiff Adam received the Notice Letter, by U.S. mail, directly addressed to Plaintiff Adam, which was dated November 8, 2024. According to the Notice Letter, Plaintiff Adam's PII was improperly accessed and obtained by unauthorized third parties, including the: name, address, and/or social security number of hers and/or her spouse, a co-applicant, or a dependent.[63]

259. Plaintiff Adam is extremely careful about sharing her sensitive PII. Plaintiff Adam is HIPAA trained and stores any documents containing her PII in a safe and secure location, shreds financial documents, and changes her passwords frequently. She has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Plaintiff Adam would not have entrusted her PII to Defendants had she known of Defendants' lax data security policies.

260. Plaintiff Adam suffered actual injury from having her PII compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) theft of her PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) nominal damages; (viii) out of pocket losses in the form of travel expenses; and (ix) the continued and certainly increased risk to her PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII.

---

[63] *See* Exhibit J.

261.    Plaintiff Adam also suffered actual fraud and identity theft as a result of the Data Breach. Specifically, Plaintiff Adam suffered multiple fraudulent charges to her debit card in early 2025, which resulted in her financial institution freezing her debit card. The fraud perpetrated by these unknown and unauthorized actors necessitated Plaintiff Adam obtaining a new debit card on three separate occasions since the date of the Data Breach.

262.    Moreover, as a direct result of the Data Breach, Plaintiff Adam suffered further out of pocket losses in the form of travel expenses when she was forced to travel to and from her bank on three separate occasions, roughly 24 miles in total, in order to obtain her new debit cards.

263.    Because of the fraudulent charges, Plaintiff Adam enrolled in a credit monitoring service in early 2025.

264.    Plaintiff Adam also discovered inaccurate reporting on her credit report in the last two months which she believes was caused by the Data Breach, that she was forced to dispute.

265.    Plaintiff Adam additionally suffered actual injury in the form of experiencing an increase in spam calls, texts, and/or emails, and targeted phishing attempts, which, upon information and belief, was caused by the Data Breach. She receives multiple spam calls and email per day from people pretending to be government agencies or financial companies with whom she had no prior contact, requesting that Plaintiff Adam provide them additional sensitive information. This misuse of her PII was caused, upon information and belief, by the fact that cybercriminals are able to easily use the information compromised in the Data Breach to find more information about an individual, such as their phone number or email address, from publicly available sources, including websites that aggregate and associate personal information with the owner of such information. Criminals often target data breach victims with spam emails, calls, and texts to gain

access to their devices with phishing attacks or elicit further personal information for use in committing identity theft or fraud.

266.    As a result of the Data Breach, Plaintiff Adam made reasonable efforts to mitigate the impact of the Data Breach, including research and verifying the legitimacy of the Data Breach, contacting credit bureaus, contacting her banks and card issuers, continuously monitoring her accounts, investigating suspicious activity on her accounts, cancelling her debit cards and requesting reissuance on three separate occasions, and changing her passwords for at-risk, sensitive, and financial accounts. Plaintiff Adam has spent at least four hours dealing with the Data Breach—valuable time Plaintiff Adam otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

267.    To the best of Plaintiff Adam's knowledge, she has not been impacted by any other data breaches.

268.    Defendants' Data Breach has caused Plaintiff Adam to suffer significant fear, anxiety, and stress, especially because she has co-signed on lease agreements for her children and does not want potential identity theft to have consequences for her children. Plaintiff Adam's anxiety has been compounded by the fact that Defendants have still not fully informed her of key details about the Data Breach's occurrence.

269.    As a result of the Data Breach, Plaintiff Adam is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

270.    Plaintiff Adam has a continuing interest in ensuring that her PII, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

*Plaintiff Mary Moses*

271.    Plaintiff Moses does not recall directly signing up for Defendant Set Forth's debt relief services. Upon information and belief, Defendants received her information through her retirement account with Ballad Health.

272.    Upon information and belief, at the time of the Data Breach, Defendants maintained Plaintiff Moses's PII in their systems, which they had access to.

273.    Plaintiff Moses received the Notice letter, by U.S. mail, from Defendant Set Forth, addressed directly to Plaintiff Moses, which was dated November 8, 2024. According to the Notice Letter, Plaintiff Moses's PII was improperly accessed and obtained by unauthorized third parties, including the name, address, and/or Social Security number of Plaintiff Moses and/or her spouse, co-applicant, or dependent.[64]

274.    Plaintiff Moses is very careful about sharing her PII. Plaintiff Moses stores any documents containing her PII in a safe and secure location. She has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Plaintiff Moses would not have entrusted her PII to Defendants had she known of their lax data security policies.

275.    In order and as a condition to obtain debt relief services from Defendants, Plaintiff Moses was required to provide her PII to Defendants.

276.    Plaintiff Moses incurred unauthorized charges from Walmart ranging from $1 to $400 on her Truist account.

277.    As a result of the Data Breach, Plaintiff Moses made reasonable efforts to mitigate the impact of the Data Breach, including research and verifying the legitimacy of the Data Breach, contacting credit bureaus, contacting her banks and card issuers, continuously monitoring her

---

[64] *See* Exhibit K.

accounts, investigating suspicious activity on her accounts, and changing her passwords for at-risk, sensitive, and financial accounts. Plaintiff Moses has spent over 40 hours dealing with the Data Breach—valuable time Plaintiff Moses otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

278.    Plaintiff Moses suffered actual injury from having her PII compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) theft of PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to her PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII.

279.    The Data Breach has caused Plaintiff Moses to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendants have still not fully informed her of key details about the Data Breach's occurrence.

280.    As a result of the Data Breach, Plaintiff Moses anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

281.    As a result of the Data Breach, Plaintiff Moses is at a present risk and will continue to be at increased risk of identity theft and fraud for life.

282.    Plaintiff Moses has a continuing interest in ensuring that her PII, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

283.    Plaintiff Moses greatly values her privacy and would not have provided her PII or undertaken the services and paid the amounts that she did, or amounts paid on her behalf, if she had known that her PII would be maintained using inadequate data security systems.

## CLASS ACTION ALLEGATIONS

284.    Plaintiffs bring this action on behalf of themselves, and all others similarly situated ("Class Members"). Pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(1), 23(b)(2) and 23(b)(3), 23(c)(4), and/or 23(c)(5) as applicable, Plaintiffs propose the following Nationwide Class and Subclass definitions, subject to amendment as appropriate:

> **Nationwide Class:** All natural persons residing in the United States whose Personally Identifiable Information was compromised as a result of the Data Breach.

> **Illinois Subclass:** All natural persons residing in the State of Illinois whose Personally Identifiable Information was compromised as a result of the Data Breach.

> **California Subclass:** All natural persons residing in the State of California whose Personally Identifiable Information was compromised as a result of the Data Breach.

285.    Excluded from the Class and Subclasses are the following individuals and/or entities: Defendants and Defendants' parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendants have a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to their departments,

agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

286.    Plaintiffs reserve the right to modify or amend the definition of the proposed classes or add Classes or Subclasses if further information and discovery indicate that the definitions of the Class should be narrowed, expanded, or otherwise modified.

287.    **Numerosity under Federal Rule of Civil Procedure 23(a)(1)**. The members of the Class (and Subclasses) are so numerous and geographically dispersed that individual joinder of all Class Members is impracticable. Based upon public filings, the current number of people impacted by the Data Breach is approximately 1.5 million.

288.    **Commonality under Federal Rule of Civil Procedure 23(a)(2).** There are questions of law and fact common to Plaintiffs and Class Members, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

    a)  Whether Defendants unlawfully used, maintained, or disclosed Plaintiffs' and the Class Members' PII;

    b)  Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the PII compromised in the Data Breach;

    c)  Whether Defendants truthfully represented the nature of their security systems, including their vulnerability to hackers;

    d)  Whether Defendants' data security protocols prior to and during the Data Breach complied with applicable data security laws and regulations;

    e)  Whether Defendants' data security protocols prior to and during the Data Breach were consistent with industry standards;

    f)  Whether Defendants each owed a duty to Class Members to safeguard their PII;

    g)  Whether Defendants each owed a duty not to disclose the PII of Plaintiffs and Class Members to unauthorized third parties;

h) Whether Defendants each owed a duty not to use the PII of Plaintiffs and Class Members for non-business purposes;

i) Whether Defendants breached their duties to Class Members to safeguard their PII;

j) Whether Defendants breached their duties not to disclose the PII of Plaintiffs and Class Members to unauthorized third parties;

k) Whether Defendants breached their duties not to use the PII of Plaintiffs and Class Members for non-business purposes;

l) Whether cybercriminals obtained, sold, copied, stored or released Class Members' PII;

m) Whether Defendants knew or should have known that their data security programs and monitoring processes were deficient;

n) When Defendants actually learned of the Data Breach;

o) Whether Defendants adequately, promptly, and accurately informed Plaintiffs and Class Members that their PII was compromised;

p) Whether Defendants adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

q) Whether Defendants violated the law by failing to adequately, promptly, and accurately inform Plaintiffs and Class Members that their PII was compromised;

r) Whether Class Members suffered legally cognizable damages as a result of Defendants' misconduct; and

s) Whether Plaintiffs and Class Members are entitled to damages, treble damages, civil penalties, punitive damages, and/or injunctive relief.

289. **Typicality under Federal Rule of Civil Procedure 23(a)(3).** Plaintiffs' claims are typical of those of the Class Members because Plaintiffs' PII, like that of every Class Member, was compromised in the Data Breach.

290. **Adequacy of Representation under Federal Rule of Civil Procedure 23(a)(4).** Plaintiffs will fairly and adequately represent and protect the interests of Class Members, including those from states and jurisdictions where they may not reside. Plaintiffs seek no relief

that is antagonistic or adverse to the Class Members and the infringement of the rights and the damages they have suffered are typical of other Class Members. Plaintiffs' counsel are competent and experienced in litigating complex class actions and data breach litigation, and Plaintiffs intend to prosecute this action vigorously.

291. **Predominance under Federal Rule of Civil Procedure 23(b)(3).** Set Forth and Centrex have each engaged in a common course of conduct toward Plaintiffs and Class Members, in that all Plaintiffs' and the Class Members' data at issue here was stored by Defendants and was accessed during the Data Breach. The common issues arising from Defendants' respective conduct affecting Class Members, as described *supra*, predominate over any individualized issues. Adjudication of the common issues in a single action has important and desirable advantages of judicial economy.

292. **Superiority under Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members could find that the cost of litigating their individual claim is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendants. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

293. **Injunctive Relief is Appropriate under Federal Rule of Civil Procedure 23(b)(2).** Defendants failed to take actions to safeguard Plaintiffs' and Class Members' PII such

- 63 -

that injunctive relief is appropriate and necessary. Defendants have acted on grounds that apply generally to the Class (and Subclasses) as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

**CLAIMS FOR RELIEF**

**CLAIM I - Negligence**
**(On Behalf of Plaintiffs and the Nationwide Class Against All Defendants)**

294.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 293 as if fully set forth herein.

295.    Defendants knowingly collected, came into possession of, and maintained Plaintiffs' and Class Members' PII, and had a duty to exercise reasonable care in safeguarding, securing, and protecting such Information from being disclosed, compromised, lost, stolen, and misused by unauthorized parties.

296.    Defendants knew or should have known of the risks inherent in collecting the PII of Plaintiffs and Class Members and the importance of adequate security. Defendants were on notice because, on information and belief, they knew or should have known that they would be an attractive target for cyberattacks.

297.    Defendants owed a duty of care to Plaintiffs and Class Members whose PII was entrusted to them. Defendants' duties included, but were not limited to, the following:

    a) To exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting PII in their possession;

    b) To protect customers' PII using reasonable and adequate security procedures and systems compliant with industry standards;

    c) To have procedures in place to prevent the loss or unauthorized dissemination of PII in their possession;

    d) To employ reasonable security measures and otherwise protect the PII of Plaintiffs and Class Members pursuant to the FTCA and applicable industry standards;

e) To implement processes to quickly detect a data breach and to timely act on warnings about data breaches; and

f) To precisely disclose the type(s) of information compromised.

298. Defendants' duty to employ reasonable data security measures arose, in part, under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

299. Defendants owed a duty under common law to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, and deleting PII in their possession from being compromised, stolen, or misused by unauthorized persons.

300. Specifically, this duty included, among other things: (a) implementing industry standard data security safeguards to protect the PII of Plaintiffs and Class Members such as MFA, rotating credentials, and restricting access privileges; (b) maintaining, testing, and monitoring Defendants' security systems to ensure that PII was adequately secured and protected; (c) timely acting upon warnings and alerts to respond to intrusions; and (d) adequately notifying Plaintiffs and Class Members about the types of data that were compromised in the Data Breach.

301. Defendants had a common law duty to prevent foreseeable harm to others. This duty existed because Defendants collected and stored valuable PII that is routinely targeted by cybercriminals. Plaintiffs and Class Members were the foreseeable and probable victims of any compromise due to Defendants' inadequate data security practices. Defendants owed Plaintiffs and Class Members a duty of care not to subject them to an unreasonable risk of harm.

302. Defendants had a special relationship with their current and former customers, including Plaintiffs and Class Members.

303. Plaintiffs' and Class Members' willingness to entrust Defendants with their PII was predicated on the understanding that Defendants would take adequate security precautions to protect it. Moreover, only Defendants had the ability to protect their systems (and the PII stored thereon) from attack.

304. Defendants breached the duties owed to Plaintiffs and Class Members and were thus negligent. Although the exact methodologies employed by the unauthorized third parties are unknown to Plaintiffs at this time, on information and belief, Defendants breached their duties through some combination of the following errors and omissions that allowed the data breach to occur: (a) mismanaging their systems and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information that resulted in the unauthorized access and compromise of PII; (b) mishandling their data security by failing to assess the sufficiency of their safeguards in place to control these risks; (c) failing to design and implement information safeguards to control these risks; (d) failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures; (e) failing to evaluate and adjust their information security programs in light of the circumstances alleged herein; (f) failing to detect the breach at the time it began or within a reasonable time thereafter; (g) failing to follow their own privacy policies and practices published to their customers; (h) failing to adequately train and supervise employees and third party vendors with access or credentials to systems and databases containing sensitive PII; and (i) failing to timely patch known vulnerabilities to their computer systems or networks.

305. Defendants' duty also arose because they were bound by industry standards to protect their current and former customers' confidential PII.

306. Plaintiffs and Class Members were foreseeable victims of any inadequate security practices on the part of Defendants.

307. Defendants, through their actions and/or omissions, unlawfully breached their duty to Plaintiffs and Class Members by failing to exercise reasonable care in protecting and safeguarding Plaintiffs' and Class Members' PII within their possession.

308. Defendants, by their actions and/or omissions, breached their duty of care by failing to provide, or acting with reckless disregard for, fair, reasonable, or adequate computer systems and data security practices to safeguard the PII of Plaintiffs and Class Members.

309. Defendants breached their duties, and thus were negligent, by failing to use reasonable measures to protect Class Members' PII. The specific negligent acts and omissions committed by Defendants include, but are not limited to, the following:

    a) Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' PII;

    b) Failing to adequately monitor the security of their networks and systems;

    c) Allowing unauthorized access to Class Members' PII;

    d) Failing to comply with the FTCA and applicable industry standards;

    e) Failing to detect in a timely manner that Class Members' PII had been compromised; and

    f) Failing to timely notify Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

310. Defendants' breach of duties owed to Plaintiffs and Class Members caused Plaintiffs' and Class Members' PII to be compromised and exfiltrated, as alleged herein and admitted by Set Forth in its Notice to Plaintiffs and Class Members.

311. Defendants' breaches of duty also caused a substantial, imminent risk to Plaintiffs and Class Members of identity theft, loss of control over their PII, and/or loss of time and money to monitor their accounts for fraud.

312. As a result of Defendants' negligence in breach of their duties owed to Plaintiffs and Class Members, Plaintiffs and Class Members are in danger of imminent harm in that their PII, which is still in the possession of criminal third parties, has been and will continue to be used for fraudulent purposes.

313. Defendants also had independent duties under state laws that required them to reasonably safeguard Plaintiffs' and Class Members' PII.

314. Additionally, Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendants, of failing to use reasonable measures to protect PII. The FTC publications and orders described above also form part of the basis of Defendants' duty in this regard.

315. Defendants violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards, as described in detail herein. Defendants' conduct was particularly unreasonable given the nature and amount of PII they obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiffs and the Class.

316. Defendants' violation of Section 5 of the FTC Act is *prima facie* evidence of their negligence.

317. Plaintiffs and the Class are within the class of persons that the FTC Act was intended to protect.

318.     The harm that occurred as a result of the Data Breach is the type of harm the FTC Act was intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and the Class.

319.     As a direct and proximate result of Defendants' negligence, Plaintiffs and the Class have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the damages to and diminution in the value of their PII; (iii) the compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the present and continuing consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from tax fraud and identity theft; (vi) costs associated with placing freezes on credit reports, purchasing credit monitoring and/or identity protection; (vii) the imminent and impending risk to their PII, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect it; and (viii) present and continuing costs in terms of time, effort, and money that has been and will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and the Class.

320.     As a direct and proximate result of Defendants' negligence, Plaintiffs and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

321.    Additionally, as a direct and proximate result of Defendants' negligence, Plaintiffs and the Class have suffered and will suffer the continued risks of exposure of their PII, which remain in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII in their continued possession.

322.    In addition to monetary relief, Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendants to, *inter alia*, strengthen their data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members.

323.    As a direct and proximate result of Defendants' negligence, Plaintiffs and Class Members are entitled to damages, including actual, consequential, and nominal damages.

### CLAIM II – Breach of Implied Contract
### (On behalf of Plaintiffs and the Nationwide Class Against All Defendants)

324.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 293 as if fully set forth herein.

325.    As a condition of using Defendants' services, Defendants required Plaintiffs and Class Members to provide their PII.

326.    By mandating that Plaintiffs and Class Members provide their PII as a condition of use, Defendants implied an assent to safeguard and protect their PII.

327.    In their Privacy Policies, Defendants represented that they (i) implemented measures to help ensure an appropriate level of security for the PII and (ii) would not retain customer PII longer than necessary.

328.    Plaintiffs and Class Members would not have provided their PII to Defendants had they known that they would not safeguard their PII as promised.

329. Plaintiffs and Class Members fully performed their obligations under the implied contracts with Defendants.

330. Defendants breached the implied contracts they made with Plaintiffs and the Classes by failing to safeguard and protect their personal information, by failing to delete the information of Plaintiffs and the Class once the relationship ended, and by failing to provide timely and accurate notice to them that their PII was compromised as a result of the Data Breach.

331. As a direct and proximate result of Defendants' above-described breach of implied contract, Plaintiffs and Class Members have suffered (and will continue to suffer) ongoing, imminent, and impending threat of identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; loss of the confidentiality of the stolen confidential data; the illegal sale of the compromised data on the dark web; expenses and/or time spent on credit monitoring and identity theft insurance; time spent scrutinizing bank statements, credit card statements, and credit reports; expenses and/or time spent initiating fraud alerts, decreased credit scores and ratings; lost work time; and other economic and non-economic harm.

332. As a direct and proximate result of the Defendants' breach of implied contract, Plaintiffs and Class Members are entitled to damages, including actual damages, compensatory damages, and/or nominal damages, in an amount to be proven at trial.

### CLAIM III – Unjust Enrichment / Quasi-Contract for Restitution
### (On Behalf of Plaintiffs and the Nationwide Class Against All Defendants)

333. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 293 as if fully set forth herein.

334. This claim is brought in the alternative to breach of implied contract.

335.     Plaintiffs and the Class conferred a monetary benefit on Defendants in the form of fees paid for debt relief services. Part of these services required Defendants to safeguard the PII entrusted to them by Plaintiffs and the Class for these debt relief services.

336.     Defendants knowingly received, accepted, and appreciated the benefits conferred upon them by Plaintiffs and the Class, including the benefit of the PII they received from Plaintiffs and the Class for which they profited during the course of their business.

337.     The fees for debt relief services that Plaintiffs and the Class paid to Defendants were supposed to be used by Defendants, in part, to pay for the administrative costs of data management and security used to safeguard the PII of Plaintiffs and the Class.

338.     Defendants failed to secure Plaintiffs' and Class Members' PII, and, therefore, did not provide full compensation for the benefit Plaintiffs and the Class provided.

339.     Under principles of equity and good conscience, it would be unjust and unfair for Defendants to retain money belonging to Plaintiffs and the Class because Defendants failed to (i) implement data management and security measures mandated by FTC guidelines, (ii) dispose of PII that was no longer needed or required, and (iii) timely and accurately inform Plaintiffs and the Class of the Data Breach.

340.     As a result of Defendants' conduct, Plaintiffs and the Class suffered damages in the amount of the difference between the price they paid for Defendants' services as promised and the actually diminished value of Set Forth's debt relief services and the costs of future monitoring of their credit history for identity theft and fraud.

341.     Plaintiffs, on behalf of themselves and the other members of the Class, seek disgorgement of the money that Defendants unjustly received plus prejudgment interest, and costs.

**CLAIM IV – Declaratory Judgment**
**(28 U.S.C. § 2201)**
**(On Behalf of Plaintiffs and the Nationwide Class Against All Defendants)**

342.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 293 as if fully set forth herein.

343.     Plaintiffs, individually and on behalf of the Class, incorporate by reference each of the factual allegations contained in the preceding paragraphs as if fully set forth herein.

344.     Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. Furthermore, the Court has broad authority to restrain acts that are tortious and violate the terms of the federal and state statutes described herein.

345.     Defendants owe a duty of care to Plaintiffs and Class Members, which required Defendants to adequately monitor and safeguard Plaintiffs' and Class Members' PII.

346.     Defendants and their officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns still possess the PII belonging to Plaintiffs and Class Members.

347.     An actual controversy has arisen in the wake of the Data Breach regarding Plaintiffs' and Class Members' PII and whether Defendants are currently maintaining data security measures adequate to protect Plaintiffs and Class Members from further data breaches that compromise their PII. Plaintiffs allege that Defendants' data security measures remain inadequate. Furthermore, Plaintiffs and the Class continue to suffer injury as a result of the exposure of their PII. The risk remains that further compromises of their private information will occur in the future.

348.     Under its authority pursuant to the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a) Defendants owe a legal duty to secure the PII of Plaintiffs and the Class within their care, custody, and control under the common law, and Section 5 of FTC Act;

b) Defendants breached their duty to Plaintiffs and the Class by allowing the Data Breach to occur;

c) Defendants' existing data monitoring measures do not comply with their obligations and duties of care to provide reasonable security procedures and practices that are appropriate to protect the PII of Plaintiffs and the Class within Defendants' custody, care, and control; and

d) Defendants' ongoing breaches of said duties continue to cause harm to Plaintiffs and the Class.

349.    This Court should also issue corresponding prospective injunctive relief requiring Defendants to employ adequate security protocols consistent with industry standards to protect the PII of Plaintiffs and the Class within their custody, care, and control, including the following:

a) Order Defendants to provide lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members.

b) Order that, to comply with Defendants' obligations and duties of care, Defendants must implement and maintain reasonable security and monitoring measures, including, but not limited to:

    i.   Engaging third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendants' systems, networks, and servers on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

    ii.  Encrypting and anonymizing the existing PII within their servers, networks, and systems to the extent practicable, and purging all such information which is no longer reasonably necessary for Defendants to provide adequate services;

    iii. Engaging third-party security auditors and internal personnel to run automated security monitoring;

    iv.  Auditing, testing, and training their security personnel regarding any new or modified procedures;

    v.   Segmenting their user applications by, among other things, creating firewalls and access controls so that if one area is compromised,

hackers cannot gain access to other portions of Defendants' systems, networks, and servers;

vi. Conducting regular database scanning and security checks; and

vii. Routinely and continually conducting internal training and education to inform Defendants' internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach.

350.    If an injunction is not issued, Plaintiffs and the Class will suffer irreparable injury and will lack an adequate legal remedy to prevent another data breach or cybersecurity incident. This risk is real, immediate, and substantial. If another data breach or cybersecurity incident occurs, Plaintiffs and the Class will not have an adequate remedy at law because monetary relief alone will not compensate Plaintiffs and the Class for the serious risks of future harm. Moreover, Plaintiffs and the Class are unable to stop using Defendants' services without experiencing undue hardship. Because providing information to Defendants is a precondition for receiving debt relief services, Plaintiffs cannot cease providing this information. This would be an extreme financial hardship to Plaintiffs and Class Members.

351.    The hardship to Plaintiffs and the Class if an injunction does not issue exceeds the hardship to Defendants if an injunction is issued. Plaintiffs and the Class will likely be subjected to substantial, continued identity theft and other related damages and/or additional data breaches and exposure if an injunction is not issued. On the other hand, the cost of Defendants' compliance with an injunction requiring reasonable prospective data security measures is relatively minimal, and Defendants have a preexisting legal obligation to employ such measures.

352.    Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing a subsequent or larger data breach or cybersecurity incident, thus preventing future injury to Plaintiffs and the Class and other persons whose PII would be further compromised.

**CLAIM V – Violation of the Illinois Consumer Fraud Act**
**(815 Ill. Comp. Stat. §505/1, *et seq.*)**
**(On Behalf of Plaintiff Ewing and the Illinois Subclass Against All Defendants)**

353. Plaintiff Ewing repeats and realleges the allegations contained in paragraphs 1 through 293, as if fully set forth herein, and brings this claim on behalf of herself and the Illinois Subclass.

354. Plaintiff Ewing and the Illinois Subclass are "consumers" as defined in 815 Ill. Comp. Stat. § 505/1(e). Plaintiff Ewing, the Illinois Subclass, and Defendants are "persons" as defined in 815 Ill. Comp. Stat. § 505/1(c).

355. Defendants are engaged in "trade" or "commerce," including the provision of services, as defined under 815 Ill. Comp. Stat. § 505/1(f). Defendants engage in the sale of "merchandise" (including services) as defined by 815 Ill. Comp. Stat. § 505/1(b) and (d).

356. Defendants' conduct against Plaintiff Ewing and the Illinois Subclass is oppressive in that Plaintiff Ewing and the Illinois Subclass had no choice but to share their PII with Defendants in order to receive debt relief services. On information and belief, all financial services companies require this information. Moreover, Plaintiff Ewing and the Illinois Subclass were assured by Defendants that their PII would be secured.

357. Defendants' failure to safeguard Plaintiff Ewing's and Illinois Subclass Members' PII—leaving it exposed to cybercriminals and other unauthorized actors—constitutes a substantial injury in that Plaintiff Ewing and the Illinois Subclass will not only have to spend the remainder of their lives at greater risk for identity theft and fraud (having to constantly monitor their accounts), but also live with the knowledge that their most intimate private information is subject to public view.

358. Additionally, Defendants violated FTC guidelines by failing to promptly dispose of PII when no longer required to be stored; encrypt information stored on computer networks;

understand vulnerabilities of their networks; implement policies to correct security problems; use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack their systems; watch for large amounts of data being transmitted from their systems; and have response plans ready in the event of a breach. These failures constitute unfair acts or practices, subjecting them to an ICFA claim. 15 U.S.C. § 45.

359.    Finally, Defendants violated the Personal Information Protection Act (PIPA) by failing to immediately notify Plaintiff Ewing and the Illinois Subclass that their PII was exposed during the Data Breach. 815 ILCS § 530/10 (a) and (b). This too constitutes an unlawful practice under ICFA. 815 ILCS § 530/20.

360.    These actions also constitute deceptive and unfair acts or practices because Defendants knew the facts about their inadequate data security and failure to comply with applicable state and federal laws and industry standards would be unknown to and not easily discoverable by Plaintiff Ewing and the Illinois Subclass.

361.    Defendants knew the facts about their inadequate data security and failure to comply with applicable state and federal laws and industry standards would defeat Plaintiff Ewing's and Illinois Subclass Members' reasonable expectations about the security of their PII.

362.    Defendants intended that Plaintiff Ewing and the Illinois Subclass rely on their deceptive and unfair acts and practices and the concealment and omission of material facts in connection with Defendants' offering of goods and services.

363.    Defendants' wrongful practices were and are injurious to the public because those practices were part of Defendants' generalized course of conduct that applied to the Illinois

Subclass. Plaintiff Ewing and the Illinois Subclass have been adversely affected by Defendants' conduct and the public was and is at risk as a result thereof.

364.    In sum, Defendants' numerous failures in safeguarding Plaintiff Ewing's and Illinois Subclass Members' PII violates ICFA.

365.    As a result, Plaintiff Ewing and the Illinois Subclass have suffered and will suffer injury, including but not limited to: (a) the compromise, publication, theft, and/or unauthorized use of their PII; (b) out-of-pocket costs associated with the prevention, detection, recovery, and remediation from identity theft and fraud; (c) lost opportunity costs and lost wages associated with efforts expended and the loss of productivity from addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud; (d) the continued risk to the publication of their PII, which remains in the possession of Defendants and is subject to further breaches so long as Defendants fail to undertake appropriate measures to protect Personal Information in their possession; and (e) current and future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, remediate, and repair the impact of the Data Breach for the remainder of the lives of Plaintiff Ewing and the Illinois Subclass.

366.    Defendants' failure to safeguard Plaintiff Ewing's and Class Members' PII in violation of FTC guidelines and PIPA was the direct and proximate cause of damages incurred by Plaintiff Ewing and the Illinois Subclass.

367.    Pursuant to 815 Ill. Comp. Stat. § 505/10a(a), Plaintiff Ewing and the Illinois Subclass seek actual and compensatory damages, injunctive relief, and court costs and attorneys' fees as a result of Defendants' violations of the CFA.

**CLAIM VI – Violation of the Illinois Uniform Deceptive Trade Practices Act**
**(Ill. Comp. Stat. §510/2, *et seq.*)**
**(On Behalf of Plaintiff Ewing and the Illinois Subclass Against All Defendants)**

368.　Plaintiff Ewing repeats and realleges the allegations contained in paragraphs 1 through 293 as if fully set forth herein, and brings this claim on behalf of herself and the Illinois Subclass.

369.　Defendants are "persons" as defined by 815 Ill. Comp. Stat. §§ 510/1(5).

370.　Defendants engaged in deceptive trade practices in the conduct of their business, in violation of 815 Ill. Comp. Stat. §§ 510/2(a), including:

    a)　Representing that goods or services have characteristics that they do not have;

    b)　Representing that goods or services are of a particular standard, quality, or grade if they are of another;

    c)　Advertising goods or services with intent not to sell them as advertised; and

    d)　Engaging in other conduct that creates a likelihood of confusion or misunderstanding.

371.　Defendants' deceptive trade practices include:

    a)　Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff Ewing's and Illinois Subclass Members' PII, which was a direct and proximate cause of the Data Breach;

    b)　Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

    c)　Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Ewing's and Illinois Subclass Members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45, the Illinois Insurance Information and Privacy Protection Act, 215 Ill. Comp. Stat. § 5/1014, Illinois laws regulating the use and disclosure of Social Security Numbers, 815 Ill. Comp. Stat § 505/2RR, and the Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. § 510/2(a), which was a direct and proximate cause of the Data Breach;

d) Misrepresenting that they would protect the privacy and confidentiality of Plaintiff Ewing's and Illinois Subclass Members' PII, including by implementing and maintaining reasonable security measures;

e) Misrepresenting that they would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Ewing's and Illinois Subclass Members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45, Illinois laws regulating the use and disclosure of Social Security Numbers, 815 Ill. Comp. Stat § 505/2RR, and the Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. § 510/2(a);

f) Failing to timely and adequately notify Plaintiff Ewing and Illinois Subclass Members of the Data Breach;

g) Omitting, suppressing, and concealing the material fact that they did not reasonably or adequately secure Plaintiff Ewing's and Illinois Subclass Members' PII; and

h) Omitting, suppressing, and concealing the material fact that they did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Ewing's and Illinois Subclass Members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45, Illinois laws regulating the use and disclosure of Social Security Numbers, 815 Ill. Comp. Stat § 505/2RR, and the Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. § 510/2(a).

372. Defendants' representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendants' data security and ability to protect the confidentiality of consumers' PII.

373. The above unfair and deceptive practices and acts by Defendants were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiff Ewing and Illinois Subclass Members that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

374. As a direct and proximate result of Defendants' unfair, unlawful, and deceptive trade practices, Plaintiff Ewing and Illinois Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from fraud and identity theft; time and expenses related to monitoring their financial

accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; and loss of value of their PII.

375.     Plaintiff Ewing and Illinois Subclass Members seek all monetary and non-monetary relief allowed by law, including injunctive relief and reasonable attorney's fees.

### CLAIM VII - Violation of the California Consumer Privacy Act of 2018 ("CCPA") Cal. Civ. Code § 1798, *et seq.* (On Behalf of Plaintiff Meza and Adam and the California Subclass Against All Defendants)

376.     Plaintiffs Meza and Adam re-allege and incorporate by reference all preceding allegations contained in paragraphs 1 to 293, as if fully set forth herein, and brings this claim on behalf of themselves and the California Subclass (the "Class" for the purposes of this count).

377.     The California Consumer Privacy Act ("CCPA"), Cal. Civ. Code § 1798.150(a), creates a private cause of action for violations of the CCPA.  Section 1798.150(a) specifically provides:

> Any consumer whose nonencrypted and nonredacted personal information, as defined in subparagraph (A) of paragraph (1) of subdivision (d) of Section 1798.81.5, is subject to an unauthorized access and exfiltration, theft, or disclosure as a result of the business's violation of the duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information may institute a civil action for any of the following:

> > (A)  To recover damages in an amount not less than one hundred dollars ($100) and not greater than seven hundred and fifty ($750) per consumer per incident or actual damages, whichever is greater.

> > (B)  Injunctive or declaratory relief.

> > (C)  Any other relief the court deems proper.

378.     Defendant Set Forth is a "business" under Civil Code § 1798.140(d) in that it is a corporation organized for profit or financial benefit of its shareholders or other owners, with gross revenue in excess of $25 million.

379. Defendant Centrex is a "business" under Civil Code § 1798.140(d) in that it annually buys, sells, or shares the personal information of 100,000 or more consumers or households.

380. Plaintiffs Meza and Adam and Class Members are covered "consumers" under § 1798.140(i) in that they are natural persons who are California residents.

381. Plaintiffs Meza's and Adams' and Class Members' personal information, as defined by Civil Code section 1798.140(v)(1), was subject to unauthorized access and exfiltration, theft, or disclosure. The Data Breach described herein exposed, without limitation, names, addresses, and Social Security numbers.

382. Defendants maintained Plaintiffs Meza's and Adam's and Class Members' PII in a form that allowed criminals to access it.

383. Defendants knew or should have known that their computer systems and data security practices were inadequate to safeguard the Class Members' personal information and that the risk of a data breach or theft was highly likely. Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information of Plaintiffs Meza and Adam and the Class Members. Specifically, Defendants subjected Plaintiffs Meza's and Adam's and the Class Members' nonencrypted and nonredacted personal information to an unauthorized access and exfiltration, theft, or disclosure as a result of the Defendants' violation of the duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information, as described herein.

384. As a direct and proximate result of Defendants' violation of their duty, the unauthorized access and exfiltration, theft, or disclosure of Plaintiffs Meza's and Adam's and Class Members' personal information included exfiltration, theft, or disclosure through Defendants'

servers, systems, and website, and/or the dark web, where hackers further disclosed the personal identifying information alleged herein.

385.     As a direct and proximate result of Defendant's acts, Plaintiffs Meza and Adam and the Class Members were injured and lost money or property, including but not limited to the loss of Plaintiffs Meza's and Adam's and Class Members' legally protected interest in the confidentiality and privacy of their personal information, stress, fear, and anxiety, nominal damages, and additional losses described above.

386.     Consistent with Civil Code Section 1798.150(b), Plaintiff Meza's counsel sent a CCPA notice letter to Defendant Set Forth's registered service agents via certified mail on October 24, 2025.

387.     Consistent with Civil Code Section 1798.150(b), Plaintiff Adam's counsel sent a CCPA notice letter to Defendant Set Forth's registered service against via certified mail on November 18, 2024.

388.     Consistent with Civil Code Section 1798.150(b), Plaintiff Meza's counsel will send a CCPA notice letter to Defendant Centrex's registered service agents via certified mail.

389.     Consistent with Civil Code Section 1798.150(b), Plaintiff Adam's counsel will send a CCPA notice letter to Defendant Centrex's registered service agents via certified mail.

390.     Defendant Set Forth failed to respond to Plaintiff Adam's CCPA Notice Letter within 30 days of the mailing of such CCPA notice letter, precluding any defense by Defendant Set Forth as to it having cured the CCPA violations described within, consequently, Plaintiff Adam seeks actual damages and statutory damages of no less than $100 and up to $750 per customer record subject to the Data Breach on behalf of the California Subclass as authorized by the CCPA.

391.     If Defendant Centrex has not rectified or otherwise cured the CCPA violations described within, which would require retrieving the PII and securing the PII from continuing and future use, within 30 days of delivery of such CCPA notice letter, Plaintiffs Meza and Adam will amend this complaint to seek actual damages and statutory damages of no less than $100 and up to $750 per customer record subject to the Data Breach on behalf of the California Subclass as authorized by the CCPA from Defendant Centrex.

392.     Accordingly, Plaintiffs Meza and Adam and the Class Members by way of this complaint seek actual damages and injunctive relief pursuant to Cal. Civ. Code Section 1798.150(a) as a result of Defendants' violations described herein.

**CLAIM VIII - Violation of the California Customer Records Act ("CCRA")**
**Cal. Civ. Code § 1798.80, *et seq.***
**(On Behalf of Plaintiffs Meza and Adam and the California Subclass Against All Defendants)**

393.     Plaintiffs Meza and Adam, re-allege and incorporate by reference all preceding allegations contained in paragraphs 1 to 293, as if fully set forth herein, and brings this claim on behalf of themselves and the California Subclass (the "Class" for the purposes of this count).

394.     "[T]o ensure that personal information about California residents is protected," the California legislature enacted Cal. Civ. Code § 1798.81.5, which requires that any business that

> owns, licenses, or maintains personal information about a California resident shall implement and maintain reasonable security procedures and practices appropriate to the nature of the information, to protect the personal information from unauthorized access, destruction, use, modification, or disclosure.

395.     Defendants are businesses that own, maintain or license personal information, within the meaning of Cal. Civ. Code § 1798.81.5, about Plaintiff Meza and Class Members.

396.     Defendants violated Cal. Civ. Code § 1798.81.5 by failing to implement reasonable measures to protect Class Members' PII.

397.    Businesses that own or license computerized data that includes personal information are required to notify California residents when their PII has been acquired (or has reasonably believed to have been acquired) by unauthorized persons in a data security breach "in the most expedient time possible and without unreasonable delay." Cal. Civ. Code § 1798.82. Among other requirements, the security breach notification must include "the types of personal information that were or are reasonably believed to have been the subject of the breach." Cal. Civ. Code § 1798.82.

398.    Defendants are businesses that own or license computerized data that includes personal information as defined by Cal. Civ. Code § 1798.82.

399.    Plaintiffs Meza's and Adam's and Class Members' PII includes personal information identified in Cal. Civ. Code § 1798.82(h) such as their names, and Social Security numbers, and is thereby covered by Cal. Civ. Code § 1798.82.

400.    Plaintiffs Meza and Adam and Class Members are "customers" within the meaning of Cal. Civ. Code § 1798.80(c), as their personal information was provided to Defendants for the purpose of utilizing Defendants' services.

401.    The Data Breach constituted a breach of Defendants' security systems, networks, and servers.

402.    Because Defendants reasonably believed that Plaintiffs Meza's and Adam's and Class Members' PII was acquired by unauthorized persons during the Data Breach, Defendants had an obligation to disclose the data breach in a timely and accurate fashion as mandated by Cal. Civ. Code § 1798.82.

403.    Defendants unreasonably delayed informing Plaintiffs Meza and Adam and Class Members about the breach of security of their PII after they knew the breach had occurred.

404. Upon information and belief, no law enforcement agency instructed Defendants that notification to Class Members would impede an investigation.

405. Thus, by failing to disclose the Data Breach in a timely and accurate manner, Defendants also violated Cal. Civ. Code § 1798.82.

406. Pursuant to Cal. Civ. Code § 1798.84, "[a]ny waiver of a provision of this title is contrary to public policy and is void and unenforceable," "[a]ny customer injured by a violation of this title may institute a civil action to recover damages," and "[a]ny business that violates, proposed to violate, or has violated this title may be enjoined."

407. As a direct and proximate result of Defendants' violations of Cal. Civ. Code §§ 1798.81.5 and 1798.82, Plaintiff Meza and Class Members were (and continue to be) injured and suffered (and will continue to suffer) damages, as described above.

408. Plaintiffs Meza and Adam and Class Members seek relief under Cal. Civ. Code § 1798.84, including, but not limited to, actual damages, any applicable statutory damages, and equitable and injunctive relief.

### CLAIM IX - Violation of the Unfair Competition Law ("UCL") Cal. Bus. And Prof. Code § 17200 *et seq.* (On Behalf of Plaintiffs Meza and Adam and the California Subclass Against All Defendants)

409. Plaintiffs Meza and Adam re-allege and incorporate by reference all preceding allegations contained in paragraphs 1 to 293, as if fully set forth herein, and brings this claim on behalf of themselves and the California Subclass (the "Class" for the purposes of this count).

410. Plaintiffs Meza and Adam plead this claim for equitable relief, including restitution and injunctive relief, in the alternative to their claims for damages.

411. The UCL proscribes "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

412.    Defendants' actions as alleged herein constitute an "unlawful" practice as encompassed by Cal. Bus. & Prof. Code §§ 17200 *et seq.* because Defendants' actions: (a) violated the California Consumer Records Act, Cal. Civ. Code §§ 1798.80 *et seq.*, (b) violated the CCPA, Cal. Civ. Code §§ 1798.100 *et seq.*, (c) constituted negligence; and (d) violated federal law and regulations, including the FTC Act.

413.    Defendants' actions as alleged herein also constitute an "unfair" practice as encompassed by Cal. Bus. & Prof. Code §§ 17200 *et seq.*, because they offend established public policy and are immoral, unethical, oppressive, unscrupulous, and substantially injurious. The harm caused by Defendants' wrongful conduct outweighs any utility of such conduct and has caused—and will continue to cause—substantial injury to the Class, including Plaintiffs Meza and Adam. There were ample reasonably available alternatives that would have furthered Defendants' legitimate business practices, including using industry-standard technologies to protect data (e.g., two-factor authorization, effective encryption and anonymization, compartmentalization of sensitive data, software patches, limiting how much data any user may access, and the purging of data no longer necessary for Defendants' services). Defendants also unreasonably delayed in notifying Plaintiffs Meza and Adam and Class Members regarding the unauthorized release and disclosure of their PII. Additionally, Defendants' conduct was "unfair" because it violated the legislatively declared policies reflected by California's strong data-breach and online-privacy laws, including the California Consumer Records Act, Cal. Civ. Code §§ 1798.80, *et seq.*, the CCPA, Cal. Civ. Code §§ 1798.100, *et seq.*, and the California constitutional right to privacy, Cal. Const. Art. 1, § 1.

414.    The harm from Defendants' conduct was not reasonably avoidable by consumers. Plaintiffs Meza and Adam and Class Members were required to provide their PII to receive

Defendants' debt relief services. Plaintiffs Meza and Adam and Class Members did not know of, and had no reasonable means of discovering, that their information would be exposed to hackers through inadequate data security measures.

415.  There were reasonably available alternatives that would have furthered Defendants' business interests of electronically transferring their customers' information while protecting PII.

416.  A reasonable person would regard Defendants' derelict data security and the Data Breach as important, material facts that could and should have been disclosed.

417.  As a direct and proximate result of Defendants' unlawful and unfair conduct, Plaintiffs Meza and Adam lost money or property because their sensitive personal information experienced a diminution of value and because they devoted additional time to monitoring their financial accounts for fraudulent activity. Plaintiffs Meza and Adam face ongoing and impending damages related to theft of their PII.

418.  Defendants' wrongful practices constitute a continuing course of unfair competition because, on information and belief, Defendants have failed to remedy their lax security practices. Plaintiffs Meza and Adam and the Class seek equitable relief pursuant to Cal. Bus. & Prof. Code § 17203 to end Defendants' wrongful practices and require Defendants to maintain adequate and reasonable security measures to protect the PII of Plaintiffs Meza and Adam and the Class.

419.  Plaintiffs Meza and Adam and Class Members lack an adequate remedy at law because the injuries here include an imminent risk of identity theft and fraud that can never be fully remedied through damages, ongoing identity theft and fraud.

420.  Further, if an injunction is not issued, Plaintiffs Meza and Adam and the Class will suffer irreparable injury. The risk of another such breach is real, immediate, and substantial.

Defendants have still not provided adequate information on the cause and scope of the Data Breach. Plaintiffs Meza and Adam and Class Members lack an adequate remedy at law that will reasonably protect against the risk of a further breach.

421.    Plaintiffs Meza and Adam and the Class also seek an order requiring Defendants to make full restitution of all monies they received through their wrongful conduct, along with all other relief permitted under Cal. Bus. & Prof. Code §§ 17200 *et seq.*

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, request the following relief:

A.  An Order certifying the Nationwide Class, the Illinois and California Subclasses, and their counsel to represent each such class;

B.  Equitable relief enjoining Defendants from engaging in the wrongful conduct complained of herein pertaining to the misuse of and/or disclosure of the PII of Plaintiffs and Class Members and from refusing to issue prompt, complete, and accurate disclosures to Plaintiffs and Class Members, and from refusing to issue prompt, complete, and accurate disclosures to Plaintiffs and Class Members.

C.  Injunctive relief, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members, including but not limited to an order:

a)  Prohibiting Defendants from engaging in the wrongful and unlawful acts described herein;

b)  Requiring Defendants to protect, including through encryption, all data collected through the course of their business in accordance with all applicable regulations, industry standards, and federal, state, or local laws; requiring Defendants to provide out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or

unauthorized use of their PII for Plaintiffs' and Class Members' respective lifetimes;

c) Requiring Defendants to delete, destroy, and purge the PII of Plaintiffs and Class Members unless Defendants can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiffs and Class Members;

d) Requiring Defendants to implement and maintain a comprehensive information security program designed to protect the confidentiality and integrity of PII of Plaintiffs and Class Members;

e) Requiring Defendants to engage independent third-party security personnel regarding any new or modified procedures requiring Defendants to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendants' systems on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

f) Requiring Defendants to engage independent third-party security auditors and internal personnel to run automated security monitoring;

g) Requiring Defendants to audit, test, and train their security personnel regarding any new or modified procedures;

h) Requiring Defendants to segment data by, among other things, creating firewalls and access controls so that if one area of Defendants' network is compromised, hackers cannot gain access to other portions of Defendants' systems;

i) Requiring Defendants to conduct regular database scanning and securing checks;

j) Requiring Defendants to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiffs and Class Members;

k) Requiring Defendants to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

l) Requiring Defendants to implement a system of tests to assess their respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendants' policies, programs, and systems for protecting personal identifying information;

m) Requiring Defendants to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendants' information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

n) Requiring Defendants to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves;

o) Requiring Defendants to implement logging and monitoring programs sufficient to track traffic to and from Defendants' servers; and for a period of 10 years, appointing a qualified and independent third party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendants' compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

D. For an award of damages, including actual, consequential, statutory, and nominal damages, as allowed by law in an amount to be determined;

E. For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F. For prejudgment and post judgment interest on all amounts awarded; and Such other and further relief as this Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury on all issues so triable.

DATED: November 10, 2025               Respectfully submitted,

By: */s/ Raina C. Borrelli*
**STRAUSS BORRELLI PLLC**
RAINA C. BORRELLI
980 N. Michigan Avenue, Suite 1610
Chicago, IL 60611
Telephone: 872/263-1100
Facsimile: (872) 263-1109
raina@strausborrelli.com

/s/ Gary M. Klinger
**MILBERG COLEMAN BRYSON PHILLIPS
GROSSMAN LLC**
GARY M. KLINGER
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Telephone: 866/252-0878
gklinger@milberg.com

*/s/ Sabita J. Soneji*
**TYCKO & ZAVAREEI LLP**
SABITA J. SONEJI*
1970 Broadway, Suite 1070
Oakland, CA 94612
Telephone: 510/254-6808
ssoneji@tzlegal.com

***Plaintiffs' Interim Co-Lead Counsel***

Leigh S. Montgomery*
**EKSM, LLP**
4200 Montrose, Ste. 200
Houston, Texas 77006
Phone: (888) 350-3931
Fax: (888) 276-3455
lmontgomery@eksm.com

Jeff Ostrow**
**KOPELOWITZ OSTROW P.A.**
One West Las Olas Blvd., Suite 500
Fort Lauderdale, FL 33301
Tel: 954.332.4200
ostrow@kolawyers.com

Terence R. Coates
**MARKOVITS, STOCK & DEMARCO, LLC**
119 E. Court Street, Suite 530
Cincinnati, OH 45202
Phone: (513) 651-3700
Fax: (513) 665-0219
tcoates@msdlegal.com

J. Gerard Stranch, IV*
**STRANCH, JENNINGS & GARVEY, PLLC**
223 Rosa L. Parks Ave., Suite 200
Nashville, TN 37203
Tel: (615) 254-8801
gstranch@stranchlaw.com

Lori G. Feldman
**GEORGE FELDMAN McDONALD, PLLC**
102 Half Moon Bay Drive
Croton-on-Hudson, NY 10520
Tel: (917) 983-9321
lfeldman@4-justice.com

M. Anderson Berry
**EMERY REDDY, PC**
600 Stewart Street, Suite 1100
Seattle, WA 98101
916.823.6955 (Tel)_
206.441.9711 (Fax)
anderson@emeryreddy.com

Amber L. Schubert*
**SCHUBERT JONCKHEER & KOLBE LLP**
2011 Union St., Suite 200
San Francisco, CA 94123
Telephone: (415) 788-4220
Facsimile: (415) 788-0161
aschubert@sjk.law

Charles E. Schaffer
**LEVIN SEDRAN & BERMAN LLP**
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Tel: (215) 592-1500
cschaffer@lfsblaw.com

Ian J. Engdahl*

**HAUSFELD LLP**
888 16th Street, N.W., Suite 300
Washington, DC 20006
Tel.: (202) 540-7200
iengdahl@hausfeld.com

Thomas A. Zimmerman, Jr. (IL #6231944)
tom@attorneyzim.com
**ZIMMERMAN LAW OFFICES, P.C.**
77 W. Washington Street, Suite 1220
Chicago, Illinois 60602
Tel: (312) 440-0020
Fax: (312) 440-4180

*Executive Committee Members*

Daniel Srourian**
**SROURIAN LAW FIRM, P.C.**
468 N. Camden Dr., Suite 200
Beverly Hills, California 90210
Telephone: (213) 474-3800
Facsimile: (213) 471-4160
Email: daniel@slfla.com

Leanna A. Loginov, Esq.
lloginov@shamisgentile.com
**SHAMIS & GENTILE P.A.**
14 NE 1st Ave., Suite 705
Miami, Florida 33132
Tel: (305) 479-2299

Kevin Cox**
**THE LYON FIRM**
2754 Erie Avenue
Cincinnati, OH 45208
Phone: (513) 381-2333
Fax: (513) 766-9011
Email: kcox@thelyonfirm.com

Jonathan S. Mann*
**PITTMAN, DUTTON, HELLUMS, BRADLEY
& MANN, P.C.**
2001 Park Place North, Suite
1100 Birmingham, AL 35203
Phone: (205) 322-8880
jonm@pittmandutton.com

Zachary Arbitman (Bar No. 314274)
**FELDMAN SHEPHERD WOHLGELERNTER
TANNER WEINSTOCK DODIG, LLP**
1845 Walnut Street, floor 21
Philadelphia, PA 19103
Phone: 215.567.8300
zarbitman@feldmanshepherd.com

Stephen R. Basser**
**BARRACK, RODOS & BACINE**
600 West Broadway, Suite 900
San Diego, CA 92101
Telephone: (619) 230-0800
Facsimile: (619) 230-1874
sbasser@barrack.com

Thiago M. Coelho**
**WILSHIRE LAW FIRM, PLC**
3055 Wilshire Blvd., 12th Floor
Los Angeles, CA 90010
T: (213) 381-9988
F: (213) 381-9989
E: thiago@wilshirelawfirm.com

Francesca K. Burne*
**MORGAN & MORGAN COMPLEX
LITIGATION GROUP**
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
Phone: (813) 223-5505
fburne@ForThePeople.com

Carl V. Malmstrom
**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLC**
111 W. Jackson Blvd, Suite 1700
Chicago, Illinois 60604
t: 312-984-0000
malmstrom@whafh.com

Marc H. Edelson**
**EDELSON LECHTZIN LLP**
411 S. State Street, Suite N300
Newtown, PA 18940
T: (215) 867-2399

medelson@edelson-law.com

Elizabeth C. Chavez (#6323726)
**FOOTE CHAVEZ LAW, LLC**
1541 E. Fabyan Parkway, Suite 101
Geneva, IL 60134
Telephone: (630) 228-9091
Facsimile: (630) 232-7452
ecc@fmcolaw.com

Danielle L. Perry*
**MASON LLP**
5335 Wisconsin Avenue, NW, Suite 640
Washington, DC 20015
Tel: (202) 429-2290
dperry@masonllp.com

*Plaintiffs' Steering Committee Members*

*Pro Hac Vice*
**Pro Hac Vice forthcoming*

## <u>CERTIFICATE OF SERVICE</u>

I, Raina C. Borrelli, hereby certify that on November 10, 2025, I electronically filed the

foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of

such filing to counsel of record, via the ECF system.

DATED this 10th day of November, 2025.

STRAUSS BORRELLI PLLC

By: */s/ Raina C. Borrelli*
Raina C. Borrelli
STRAUSS BORRELLI PLLC
One Magnificent Mile
980 N. Michigan Ave., Suite 1610
Chicago, IL 60611
Telephone: (872) 263-1100
Facsimile: (872) 263-1109
raina@straussborrelli.com